**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                          :
AGRIZAP, INC.,                            :          CIVIL ACTION
                                          :
          Plaintiff,               :
                                          :
      v.                     :          No. 04-3925
                                          :
WOODSTREAM CORPORATION, et al.,           :
                                          :
          Defendants.              :
_____:

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                **MAY 12, 2006**

      Plaintiff Agrizap, Inc. ("Agrizap") alleges that Defendant Woodstream Corporation

("Woodstream") infringed on its U.S. Patent No. 5,949,636 entitled "portable pest electrocution

device with resistive switch trigger" ("636 patent" or "Rat Zapper").  Presently pending before

this Court are: (1) the claim construction of the 636 patent; and (2) Woodstream's Motion for

Partial Summary Judgment of patent unenforceability and invalidity.  For the following reasons,

Woodstream's Motion for Partial Summary Judgment is denied.

**I.**      **BACKGROUND**

      The relationship between Agrizap and Woodstream began in 2000.  Woodstream

contacted Agrizap about the possibility of the two parties entering into a marketing agreement for

Agrizap's Rat Zapper Product.  The Rat Zapper is a consumer product that consists of a plastic

canister with a metal plate at the bottom and an electrical charge which ultimately kills the

rodent.  An oral marketing agreement was established between the two parties whereby Agrizap

would manufacture and deliver Rat Zappers to Woodstream.  The products, however, would use

Woodstream labels.

According to Agrizap's Second Amended Complaint, in early 2004, Agrizap discovered that Woodstream was manufacturing and marketing its own electronic rat trap. Agrizap asserts that confusion in the retail market developed because of Woodstream's branding of the Agrizap Rat Zapper and because of Woodstream's newly introduced rat zappers. Agrizap asserts that if this continued, Woodstream would effectively undermine Agrizap's ability to sell its goods in the market. The Second Amended Complaint contains the following five counts against Woodstream: Violation of California's Unfair Business Practices Laws & Professions Code (Count I); Breach of an Oral Contract (Count II); Patent Infringement (Count III); Intentional Misrepresentation (Count IV); and Trade Disparagement (Count V).

With respect to the patent infringement count, Agrizap alleges that patent claims 1, 2, 3, 5, 10, and 16 of the 636 patent were infringed by Woodstream. Both parties have set forth proposed patent claim constructions for these claims at issue. Woodstream has also requested that this Court schedule a *Markman* hearing, including testimony from the parties' technical experts, concerning the technical subject matter at issue in the claim constructions.

On February 23, 2006, Woodstream filed its Motion for Partial Summary Judgment. Woodstream argues that summary judgment on the patent infringement claim is appropriate on the grounds of patent unenforceability and invalidity. It believes that the facts material to these matters are not genuinely disputed.

This memorandum encompasses both the claim construction issues and Woodstream's Motion for Partial Summary Judgement. Section II will address the claim constructions for the claims of the 636 patent at issue. Section III will address Woodstream's Motion for Partial

Summary Judgment.

## II.   CLAIM CONSTRUCTION

### A.   Relevant Case Law

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005).  When the meaning or scope of a patent claim is in dispute, the Court must determine the claim's proper construction. Vivid Technologies, Inc. v. Am. Sci. and Engineering, Inc., 200 F.3d 795, 804 (Fed. Cir. 1999). The United States Court of Appeals for the Federal Circuit has emphasized that claim construction of disputed patent claims is strictly within the purview of the Court to decide. Markman v. Westview Instruments, Inc., 52 F.3d 967, 983-84 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996).

The words of a patent claim are generally given their ordinary and customary meaning. Phillips, 415 F.3d at 1312.  The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.  Id. at 1313.  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.

Thus, the Court will first look to the words of the claims themselves to define the meaning and scope of the patented invention.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Then, the Court will examine the specification and the patent's prosecution history, which are collectively referred to as intrinsic evidence.  Id.  The specification is the part of the patent that "'describe[s] the manner and process of making and using' the

patented invention." Phillips, 415 F.3d at 1315.  The specification is always highly relevant and "is the single best guide to the meaning of a disputed term."  Id.  The patent's  prosecution history consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and of the prior art cited during the examination of the patent.  Id. at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent;" however, because the prosecution history is not a final product, it lacks the clarity and usefulness of the specification for claim construction purposes.  Id.

Lastly, the Court may look to extrinsic evidence if necessary.  Vitronics, 90 F.3d at 1583.  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treastises."  Phillips, 415 F.3d at 1317.  "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."  Vitronics, 90 F.3d at 1583.  Thus, when the Court can construe a claim solely based on intrinsic evidence, it is improper to rely on extrinsic evidence. Id.

**B.      636 Patent's Claim Construction**

The claims at issue are Claims 1, 2, 3, 5, 10, and 16 of the 636 patent.  After reviewing both parties' proposed claim constructions, along with the 636 patent itself, this Court has come to the following claim constructions.[1]

---

[1]      Woodstream requests a *Markman* hearing to allow this Court to hear testimony from the parties' technical experts as to the claim constructions at issue.  Agrizap argues that a *Markman* hearing would be financially burdensome and that the claim constructions can be resolved solely on the parties' briefs.  A *Markman* hearing is often held to gather extrinsic evidence that will assist the court in the construction of patent claims.  Isogon Corp. v. Amdahl Corp., 47 F. Supp. 2d 436, 439 (S.D.N.Y. 1998).   However, a *Markman* hearing is a not a required procedure in patent infringement cases and this Court has the discretion to construe the claims based solely on the paper record.  Rogers v. DESA Int'l, Inc., 166 F. Supp. 2d 1202, 1204 (E.D. Mich. 2001).   In this instant case, a *Markman* hearing will be unnecessary because the claims can be construed based solely on the intrinsic evidence.

### 1.     Claim 1

Terms and phrases within subsections (b), (d), and (e) of Claim 1 require construction.

Claim 1(b) states:

> triggering the activation of a high voltage and current generator in response to said sensed presence, said generator coupled between said high voltage electrode and said reference electrode, said triggered generator being activated for a predetermined time period.

There are two terms in Claim 1(b) that require construction: "triggering" and "predetermined time period."

With respect to the "triggering" term, Agrizap argues that triggering is defined as "any manner of initiating, actuating or causing activation of a high voltage and current generator in response to the sensed presence, such as through hardware, software or any combination thereof." (Agrizap's Reply Br., at 8). Woodstream argues that Agrizap's definition of "triggering" is unsupported by the patent and does not consider the term in the context of Claim 1(b). Woodstream's proposed construction is: "the sensed presence of a pest results in an immediate and irreversible triggering of the high voltage and current generator without regard to any verification of the sensed presence." (Woodstream's Reply Br., at 7). In response, Agrizap argues that the triggering is neither immediate nor irreversible because after the pest makes contact, the invention allows for a delay to prevent triggering based on the momentary presence of a pest. According to the specification, when a pest makes contact, a voltage drop on the triggering mechanism occurs and there is a delay of the rising voltage to ensure that the timer is

---

See Vitronics, 90 F.3d at 1583 (stating that when claim construction can be based on intrinsic evidence alone, reliance on extrinsic evidence is improper).

not activated by a momentary presence of a pest.  (636 patent, col. 8, lines 21-36).

This Court will construe the "triggering" term as:

the sensed presence of a pest results in an immediate and irreversible triggering of
the high voltage and current generator.

As Woodstream argued, the triggering is immediate and irreversible upon sensing the pest.  The

specification supports this conclusion.  See Phillips, 415 F.3d at 1315 (stating that specification

is single best guide for determining meaning of disputed term).  The specification states that

"[g]ood contact must be established before [the] current will be large enough to trigger a timing

circuit."  (636 patent, col. 4, lines 32-36).  Furthermore, the specification states that after the

voltage drop, "Capacitor 10 creates a time constant which delays the rising voltage on TTRIG 99

to ensure that the timer is not activated by a momentary presence of a pest."  (636 patent, col. 8,

lines 32-36).  Thus, the triggering of the activation of the generator does not occur until after the

delay of the rising voltage in the triggering mechanism.  Once this delay has occurred, the

generator is triggered immediately and there is no indication in the patent that it can be reversed.

The second term within Claim 1(b) that requires construction is "predetermined time

period."  According to Claim 1(b), the triggered generator is activated for a "predetermined time

period."  Agrizap contends that "predetermined time period" means "a time period determined or

set prior to triggering of the generator, the time period being set in any manner, including using

manually or through hardware, software/ firmware, or any combination thereof.  The time period

can also comprise any number of shorter cycles."  (Agrizap's Reply Br., at 12).  Woodstream

argues that "predetermined time period" means "a single, distinct, fixed time period between

activation and deactivation of the generator." (Woodstream's Reply Br., at 8).  Woodstream

further states that the "predetermined time period cannot be indeterminate in the amount of time

or number of times that the high voltage generator is activated."  (Id.).

This Court will construe "predetermined time period" as:

the time period between activation and deactivation of the generator that has its
length programmed prior to the triggering of the generator.

The specification supports the construction that the predetermined time period is not of one set

length.  According to the specification, "the predetermined time period can be easily adjusted to

suit the application and the available power."  (636 patent, col. 4, lines 42-44).  A more thorough

description states that the predetermined time period is:

programmed through the selection of the values of resistor 14 and the capacitor
16, and proportional to the values of the resistor 14 and capacitor 16.  Those of
skill in the art will be able to program such a timer to attain the desired timing
values from the data sheet provided with the timer.  The amount of time necessary
to reliably dispose of a particular pet will depend on the typical size of the type of
pest to be dispatched and amplitude of the current and voltage the high voltage
and current generator is capable of producing.

(636 patent, col. 8, lines 54-60).  Therefore, while the "predetermined time period" is a definitive

time period, it is not of definitive length until it is programmed prior to triggering.

Next, subsection (d) of Claim 1 requires construction.  Claim 1(d) states:

deactivating said generator only upon expiration of said predetermined time
period or in response to a reset signal.

There are two terms in Claim 1(d) that require construction: "deactivating" and "reset signal."

With respect to the "deactivating" term, Agrizap argues that it should be construed as:

any manner of deactivating the generator at the end of the predetermined time
period or in response to a reset signal, the end of the predetermined time frame
being determined in any manner and the reset signal being produced and sensed in
any manner including hardware, software/ firmware or any combination thereof.

7

(Agrizap's Reply Br., at 14).  Woodstream argues that "deactivating means stopping the activated generator" and that "the generator can be deactivated only upon the two enumerated conditions and not any other conditions, i.e., deactivating can occur only upon expiration of the predetermined time period or in response to a reset signal" and "the generator must be capable of being deactivated under both [of these] recited conditions."  (Woodstream's Reply Br., at 10-11).  In response, Agrizap argues that requiring the deactivation to be performed only by these two conditions and requiring that the generator must be capable of performing both of these conditions are unsupported and unrelated limitations to this claim construction.

This Court will construe "deactivating" as:

the stopping of the activated generator either upon the expiration of the predetermined time period or in response to a reset signal.  The activated generator can be deactivated only upon either of these two conditions (expiration of predetermined time period or in response to a reset signal) and the generator must be capable of being deactivated by both of these conditions.

First, the ordinary and customary meaning of "deactivating" means making the activated generator inactive, or more simply, stopping the activated generator.  See  Webster's 3d. New Int'l Dictionary 579 (3d ed. 1993) (defining "deactivate" as "to make inactive or ineffective").  The essential disagreement between the parties, however, is not about what "deactivating" means, but rather about how "deactivating" of the activated generator occurs.  The words of Claim 1(d) themselves clearly state that deactivation occurs "only" upon (1) the expiration of the predetermined time period or (2) in response to a reset signal.  See Phillips, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms.").  Therefore, deactivation can occur only upon these two conditions and the generator must be capable of being deactivated by both of these conditions.

The "reset signal" term in Claim 1(d) requires construction. In addition, "reset signal" appears in Claim 1(e) and also requires construction. Claim 1(e) states that:

> inhibiting said triggering step once activation of said generator is triggered, until said reset signal is detected.

Essentially, Agrizap and Woodstream are arguing over whether "reset signal" in both Claims 1(d) and 1(e) refers to one specific reset signal, the power on reset signal, or whether the term encompasses various reset signals. Agrizap argued that the "reset signal" term in Claim 1(d) can be "produced and sensed in any manner including hardware, software/ firmware or any combination thereof." With respect to the "reset signal" term in Claim 1(e), Agrizap ignores the "said reset signal" term in the claim construction it provided for Claim 1(e). Woodstream argues that the "reset signal" term in Claim 1(d) is the same as the "said reset signal" term in Claim 1(e) and that the only description of a reset signal in the 636 patent is the power on reset signal.[2] Agrizap responds that Woodstream is erroneously interpreting the specification and prosecution history because the power on reset signal is not the only reset provided for in the specification.

After analyzing the wording of Claim 1(d) and Claim 1(e) in conjunction with the intrinsic evidence, this Court will construe the "reset signal" term in both Claim 1(d) and Claim 1(e) as: the power on reset signal. The power on reset signal is the signal that is generated upon the powering up of the circuit from its off condition. It is labeled as POR 97 in Fig. 4 and Fig. 5 of the 636 patent.

The "reset signal" term in Claim 1(d) and 1(e) must be interpreted the same way. The

---

[2]    In addition, Woodstream argues that the patent specification fails to disclose any "reset signal" that deactivates the generator thus making Claim 1(d) invalid under 35 U.S.C. §112. The invalidity of any claims will be discussed below in the summary judgment section.

ordinary and customary meaning of the word "said" when it is modifying a term is that it means

the "above-mentioned" term. Black's Law Dictionary, 1363 (8th ed. 2004).  When "said" is used

in a document, it refers to something that has been previously mentioned in the document.

Greeley Nat. Bank v. Wolf, 4 F.2d 67, 69 (8th Cir. 1925).  Here, "said reset signal" in Claim 1(e)

must refer to the previously mentioned "reset signal" term in Claim 1(d) because that is the only

"reset signal" mentioned prior to Claim 1(e).  Thus, the reset signal in Claim 1(d) and 1(e) are the

same reset signal.

     The construction of "reset signal" as the power on reset signal is supported by the 636

patent.  Intrinsic evidence, such as the patent itself, "is the most significant source of the legally

operative meaning of disputed claim language."  Vitronics, 90 F.3d at 1582.  The abstract of the

636 patent states that "the invention will not retrigger until reset by turning it off and then on

again, thereby activating the power on reset circuit."  (636 patent, abstract).  The following

statements from the specification show that the power on reset signal is the reset signal that needs

to be detected before retriggering:

> Timer Module 112 cannot be retriggered until it is reset via an active low logic
> signal on POR 97.  (636 patent, col. 7, lines 63-65);
>
> Once triggered, the electronic portion 1 cannot be retriggered until power is turned
> off and then on again via switch 2. (636 patent, col. 6, lines 46-48); and
>
> The logic low value of ARM 93 therefore prevents any retrigger of Timer Chip 18
> until the power is cycled off and then on by the user."  (636 patent, col. 9, lines 5-
> 10).

     Moreover, the prosecution history also shows that Agrizap argued that the "reset signal"

is the power on reset signal.  See Phillips, 415 F.3d at 1317 (stating that court should consult

patent's prosecution history).  The following is Agrizap's response to one of the Patent

10

Examiner's questions pertaining to the retriggering of the timer after deactivation:

> Applicants [Agrizap] respectfully direct the Examiner to page 21, lines 4-8, where it is explained that when the predetermined time has elapsed, the generator is inactive because the output of the time becomes inactive and that the timer cannot be retriggered until reset via POR. Page 21, line 11 through page 22, line 2 discusses the power on reset circuit and how it operates to initialize the electronic portion, including the arming of the trigger circuit of the resistive switch. Page 24, lines 5-14 discuss how the trigger circuit of the resistive switch becomes disarmed until reset once again by cycling the power and thus activating POR.

(Woodstream's Markman Ex. 2, at 000081). The patent's prosecution history shows that the triggering step is inhibited until reset by the power on reset signal.[3] Thus, the intrinsic evidence supports the construction that the reset signal in Claim 1(d) and 1(e) is the power on reset signal.

Next, the "inhibiting" term within Claim 1(e) requires construction. Agrizap argues that "inhibiting" means "any manner of preventing the triggering step once the high voltage and current generator has been triggered, the prohibiting provided through hardware, software/ firmware or any combination thereof." (Agrizap's Reply Br., at 15). Woodstream argues that "inhibiting" mean: "the triggering step is inhibited upon each and every activation of the triggering of the generator until the power on reset signal is detected; each time the high voltage generator is activated, further triggering cannot take place, at least until the power on reset signal is detected." (Woodstream's Reply Br., at 13).

This Court will adopt Woodstream's construction of the "inhibiting" term. As shown above in the construction of the "reset signal" term, the specification provides support for the

---

[3]      Agrizap tries to argue that the patent's prosecution history shows that there is a difference between the power on reset signal and other reset signals. It contends that the following statement supports its argument: "[Agrizap] amended the claims to differentiate the power on reset (POR) from the individual reset inputs of the time components." (Woodstream Markman Ex. 2, at 000080). These individual reset inputs, however, are not the reset signal addressed in Claim 1(d) and 1(e) for the reasons explained above. Furthermore, having the "reset signal" term encompass many possible different reset signals is inconsistent with the wording of Claim 1(d) and 1(e).

construction that the triggering step is inhibited until the power on reset signal is detected.  See Phillips, 415 F.3d at 1315 (stating that specification is single best guide for determining meaning of disputed term).  Specifically, the specification states that "[o]nce triggered, the electronic portion 1 cannot be retriggered until power is turned off and then on again via switch 2."  (636 patent, col. 6, lines 46-48).  Furthermore, it states that the "Timer Module 112 remains latched even after the predetermined time has elapsed and PTIME 95 has returned to a logic low level. The logic low value of ARM 93 therefore prevents any retrigger of Timer Chip 18 until the power is cycled off and then on by the user."  (636 patent, col. 9, lines 5-10).  It also states that "Timer Module 112 cannot be retriggered until it is reset via an active low logic signal on POR 97.  (636 patent, col. 7, lines 63-65).  Therefore, the triggering step is inhibited until the power on reset signal is detected.

     **2.**     **Claim 2**

Claim 2 requires construction.  It states that:

> The method of claim 1 wherein said manual reset is accomplished by cycling the power off and then on.

Agrizap argues that Claim 2 should be construed as: "reset signal produced by any manner of cycling the power off and then on, including a mechanical on/off switch, or reset button/ actuator, or cycling under control of electronics hardware, software/ firmware or a combination thereof." (Agrizap's Claim Construction Statement, at 3).  Woodstream argues that Claim 2 is indefinite and invalid under 35 U.S.C. §112 because it refers to "said manual reset" and there is no such "manual reset" phrase in claim 1.

This Court will construe "manual reset" to be the same  "power on reset signal" present in

Claim 1(d) and (e).  Agrizap's broad construction is inappropriate.  On the other hand,

Woodstream's claim of indefiniteness is also incorrect.   "[T]he context of the surrounding words

of the claim also must be considered in determining the ordinary and customary meaning of those

terms."   ACTV, Inc. v. Walt Disney Co., 346 F.3d 1082, 1088 (Fed. Cir. 2003).  Here, the

"manual reset" can be construed based on the surrounding language of Claim 2 and on the

previous constructions of "reset signal" in Claim 1(d) and 1(e).  Claim 2 is a dependent claim of

Claim 1.  While there is no preceding "manual reset" term in Claim 1 for the "said manual reset"

in Claim 2 to refer to, it will be construed to refer to the "reset signal" in Claim 1(d) and (e).  By

using the word "said," the claim must be construed to referring to a reset that was already

mentioned.  Black's Law Dictionary, at 1363.  The only "reset" mentioned in the previous Claim

1 was the "reset signal" in Claim 1(d) and 1(e).  That reset signal is the power on reset signal.

Furthermore, the "manual reset" in Claim 2 is described as being "accomplished by cycling the

power off and then on."  Cycling the power off and then on is the same functionality as the power

on reset signal.  Therefore, the "manual reset" in Claim 2 is the power on reset signal.

### 3.     Claims 3, 5, and 10

Agrizap alleges that Woodstream also infringed on Claim 3, 5, and 10.   These three

claims are written in a straightforward manner and are dependent claims of Claim 1.  This Court

will construe only those terms that are in controversy, and only to the extent necessary to resolve

that controversy.  Vivid, 200 F.3d at 803.  Here, the only possible terms in Claims 3, 5, and 10

that seem to be disputed are those terms that also appear in Claim 1, such as "triggering,"

"predetermined period," "deactivating," and "inhibiting."  Therefore, the terms in claims 3, 5,

and 10 will be construed to have their ordinary and customary meaning exactly as they are

13

written and will incorporate any prior construction of disputed terms in Claim 1.

Claim 3 will be construed exactly as it is written and will incorporate any prior construction of disputed terms in Claim 1:

> The method of claim 1 wherein said sensing step further comprises the step of creating a voltage drop with current flowing from said high voltage electrode, through said pest and into said reference electrode; and wherein said triggering step further comprises the step of activating a timer with said voltage drop, the output of said timer used to activate said generator for said predetermined time period.

Claim 5 will be construed exactly as it is written and will incorporate any prior construction of disputed terms in Claim 1:

> The method of claim 1 wherein said sensing, triggering, generating, deactivating and inhibiting steps are performed using battery power.

Claim 10 will be construed exactly as it is written:

> The method of claim 1 wherein said sufficient voltage and current does not pose a lethal danger to humans.

### 4.    Claim 16

The last claim that requires construction is Claim 16.  More specifically, its subparagraphs (b)(i), (b)(iii), and b(iv) require construction.  From the parties' briefs, however, it appears that there is not a major dispute regarding Claim 16.  As previously stated with respect to Claims 3, 5, and 10, this Court will only construe those claims truly in controversy.  Id.

In general, Claim 16 is an apparatus claim that recites the specific electronic components, such as a high voltage and current generator, a resistive switch, and a timing module.  Agrizap argues that Claim 16 covers "any form of [switch, high voltage and current generator, timing device/ module, in or through] hardware, software/ firmware or a combination thereof."

(Agrizap's Claim Construction Statement, at 4-5). Woodstream's Claim 16 constructions focus

on the actual words being used in the claim. Thus, because the words of a patent claim are

generally given their ordinary and customary meaning and the words themselves are the first

evidence examined when defining the scope of a patent claim, Woodstream's claim constructions

for Claim 16 will be adopted as stated below. See Vitronics, 90 F.3d at 1582.

Subparagraph (b)(1) of Claim 16 states:

b) an electronic portion comprising:
i) a resistive switch coupled between said high voltage electrode and said
reference electrode, said resistive switch further comprising a trigger circuit
having a trigger output and an arm/ disarm input.

This claim will be construed as: a switch that is physically connected across the electrodes. The

switch includes a distinct trigger circuit with a trigger output and an arm/ disarm input.

Subparagraph (b)(iii) of 16 states:

a timing module having an input coupled to said trigger output of said resistive
switch, a control output coupled to said generator control input and an arm/
disarm output coupled to said arm/ disarm input of said resistive switch.

This claim will be construed as: a specific distinct timing module having an input and two

outputs. The input is connected to the trigger output of the resistive switch. A control output is

connected to the high voltage generator control input. An arm/ disarm output is connected to the

arm/ disarm input of the resistive switch.

Lastly, the last clause of subparagraph (b)(iv) states:

said timing module disarms said trigger circuit of said resistive switch upon said
activation of said timer module until said timer module is reset.

This clause will be construed as: the timing module has an output that is coupled to the trigger

circuit of the resistive switch to disarm the trigger circuit until a power on reset signal re-enables

15

or re-sets the timing module.

In conclusion, these are the claim constructions for Claims 1, 2, 3, 5, 10, and 16 of the 636 patent. This Court will now address Woodstream's Motion for Partial Summary Judgment.

## III.   MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.   Summary Judgment Standard

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991)(citations omitted). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362 (3d Cir. 1992).[4] Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact for trial. See id. at 1362-63. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Finally,

---

[4]      "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998), aff'd, 172 F.3d 40 (3d Cir. 1998)(citations omitted).

"'summary judgment is as appropriate in a patent case as it is in any other case.'" See Desper

Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998)(quoting C.R. Bard, Inc.

v. Advanced Cardiovascular, Inc., 911 F.2d 670, 672 (Fed. Cir. 1990)).

### B.    Discussion

Woodstream argues that this Court should grant partial summary judgment on the patent

infringement claim on the grounds of patent unenforceability and invalidity because: (1) the 636

patent, which is the patent for the Rat Zapper, is unenforceable by reason of Agrizap's

inequitable conduct; (2) the 636 patent is invalid under 35 U.S.C. § 102(f) and § 116 by reason of

incorrect inventorship; (3) the 636 patent is invalid because the written description of the

invention is legally insufficient and the claim language is so unclear as to be inoperative and

indefinite; and (4) the 636 patent is invalid under 35 U.S.C. § 103(a) as obvious over the prior

art.  For the following reasons, Woodstream's motion is denied.

### 1.    Inequitable Conduct

Woodstream argues that the 636 patent is unenforceable because of Agrizap's inequitable

conduct.  Woodstream alleges that: (1) during the prosecution of the 636 patent, Agrizap

intentionally failed to disclose material prior art in the form of Agrizap's public use and on sale

activity of the Gopher Zapper; and (2) Agrizap wrongfully converted the inventorship of the 636

patent by eliminating one of the originally named co-inventors, Bruno Rist.

An alleged patent infringer may assert the affirmative defense of inequitable conduct by

claiming that the patentee obtained the patent by improper conduct.  Dow Chemical Co. v. Exxon

Corp., 139 F.3d 1470, 1478 (Fed. Cir. 1998).  If improper conduct on the part of the patentee is

found, this affirmative defense provides the specific relief of finding the patent unenforceable.

17

Id.  "Inequitable conduct occurs when a patentee breaches his or her duty to the Patent and Trademark Office ("PTO") of 'candor, good faith, and honesty.'" Warner-Lambert Co. v. Teva Pharm. USA, Inc., 418 F.3d 1326, 1342 (Fed. Cir. 2005).  "Affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false information, coupled with an intent to deceive" the PTO may constitute inequitable conduct.  Id.  Determining inequitable conduct requires a two-step analysis: (1) the court must determine whether the withheld information meets a threshold level of materiality and an intent to mislead the PTO; and (2) the court must weigh "the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." Ferring B.V. v. Barr Lab., Inc., 437 F.3d 1181, 1186 (Fed. Cir. 2006).  Clear and convincing evidence is required to establish inequitable conduct.  Id.  With respect to materiality, information is considered material if there is a substantial likelihood that a reasonable Patent Examiner would have considered the information important in deciding whether to issue a patent. Id. at 1187.  With respect to an intent to deceive, it need not be proven by direct evidence.  Id. at 1191.  In the absence of a credible explanation by the patentee, intent to deceive may be generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information.  Id.  It is important to note that "materiality does not presume intent, which is a separate and essential component of inequitable conduct."  Id. at 1190.

The United States Court of Appeals for the Federal Circuit has urged caution in the granting of summary judgment based on the affirmative defense of inequitable conduct.  Id. at 1186-87; Paragon Podiatry Lab., Inc. v. KLM Lab., Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993); Burlington Indus. Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988); KangaROOS USA,

18

Inc. v. Caldor, Inc., 778 F.2d 1571, 1577 (Fed. Cir. 1985). "If the facts of materiality or intent are reasonably disputed, the issue is not amenable to summary judgment." Paragon, 984 F.2d at 1190. Nevertheless, summary judgment is appropriate on the issue of intent when there has been a failure to supply highly material information and "(1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." Ferring B.V., 437 F.3d at 1191.

First, Woodstream contends that Agrizap intentionally failed to disclose material information during the 636 patent's prosecution. It contends that Agrizap did not inform the PTO of material prior art in the form of the Gopher Zapper being in public use and on sale more than one year prior to the date of the 636 patent application. According to Woodstream, if the Patent Examiner knew of this prior art, he would have rejected the patent application because he would have found the 636 patent application obvious in light of this prior art in violation of 35 U.S.C. § 103(a). Thus, Woodstream argues that Agrizap allegedly deceived the PTO by intentionally failing to inform it of this information so that the 636 patent would be improperly issued and not rejected based on obviousness grounds.

A condition for patentability is that the invention be unobvious over the prior art. 35 U.S.C. § 103(a). 35 U.S.C. § 103(a) states that an invention may not be patented:

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Essentially, an invention cannot be patented if its creation would be obvious from analyzing

related prior art.  Prior art is all of the knowledge that would have been available to any person having ordinary skill in the pertinent art of the invention trying to be patented.  Ernest Bainbridge Lipscomb, III, Libscomb's Walker on Patents, vol. 2, § 6:29 (1985).  Subsections (a) through (g) of 35 U.S.C. § 102 "serve as the standard by which to qualify what is and what is not considered 'prior art' to a particular patent."  Peter S. Canelias, Patent Practice Handbook, § 5.01[B] (2002).

35 U.S.C. § 102(b) states that a person is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." The § 102(b) public use/ on sale bar applies not just if the invention claimed in the patent application was in public use or on sale more than one year before the filing of the application, but also applies if the differences between the claimed invention and a device in public use or on sale more than one year before the claimed invention's application would have been obvious.  In re Corcoran, 640 F.2d 1331, 1333 (C.C.P.A. 1981).  Thus, strict identity between the claimed invention and the device involved in the public use or on sale activities is not necessary for § 102(b) to bar patentability.  In re Smith, 714 F.2d 1127, 1137 n.13 (Fed. Cir. 1983).  All that is necessary for § 102(b) to bar patentability is for the claimed invention to be an obvious variation of the device on sale or in public use.

Here, Woodstream claims that the differences between the Rat Zapper, which is the invention claimed in the 636 patent, and the Gopher Zapper are obvious.  Furthermore, it claims that § 102(b) is violated because the Gopher Zapper was in public use and on sale more than one year before Agrizap applied for the 636 patent.  Woodstream argues that the public use/ on sale activity of the Gopher Zapper is prior art that the Patent Examiner would have considered when

deciding whether the 636 patent is obvious had it not been withheld by Agrizap.  Because it was relevant prior art, this information was material information that Agrizap did not disclose to the PTO during the prosecution of the 636 patent.  Furthermore, Woodstream contends that Agrizap knowingly withheld this information with an intent to deceive the PTO and Agrizap has no credible explanation for the failure.  Therefore, according to Woodstream, Agrizap committed inequitable conduct that renders the 636 patent unenforceable.

This Court must decide whether there is a genuine issue of material fact regarding Woodstream's inequitable conduct defense.  The first issue in question is whether the Gopher Zapper was in public use and/ or on sale more than one year prior to the date of the 636 patent application.  The 636 patent application is dated June 7, 1994, thus making the relevant date for the § 102(b) time bar being prior to June 7, 1993.  (Woodstream Summary Judgment ("WSJ") Ex. 2, at 000001).  Woodstream contends that there is no dispute that Agrizap publicly demonstrated the Gopher Zapper by means of working samples and marketing brochures at a trade show in Long Beach, CA in February 1993.   (WSJ Ex. 7).  Agrizap acknowledges that it demonstrated one of its Gopher Zapper prototypes at a trade show in early 1993.  While there is no dispute as to Agrizap's participation in this trade show with the Gopher Zapper, this Court still needs to determine if as a matter of law, this trade show demonstration is a public use.  For the reasons stated below, it was a public use for the purposes of  § 102(b).

"Public use" of a claimed invention under § 102(b) is defined "as any use of that invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor."  Smith, 714 F.2d at 1134.  However, if the use was primarily for experimental purposes the § 102(b) bar does not apply.  Id.  This experimental use exception

21

does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention.  Id. at 1135.  Public demonstrations of inventions at trade shows have been held to be public uses because they are for commercial exploitation and not for experimentation.  See Faulkner v. Baldwin Piano & Organ Co., 561 F.2d 677, 683 (7th Cir. 1977); Electro-Nucleonics, Inc. v. Mossinghoff, 593 F. Supp. 125, 128 (D.D.C. 1984).  As stated above, Agrizap admits to publicly displaying a Gopher Zapper prototype at the trade show. (Agrizap's Summary Judgment Br., 15).  Agrizap demonstrated the Gopher Zapper to several trade show attendees interested in seeing how the product worked.  (Robert G. Noe Declaration ("Noe Dec."), at ¶10); (Patrick Frape Declaration ("Frape Dec."), at ¶5).  Agrizap's objective at the trade show was to see if there would be interest in the Gopher Zapper as well as to determine what price might be appropriate in marketing it in the future.  (Id., at ¶4).  Testing the "buying potential of the invention" does not fit within the narrow experimentation exception.  Electro-Nucleonics, 593 F. Supp. at 128; see also Smith, 714 F.2d at 1135 ("The experimental use exception, however, does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention.").  Therefore, this demonstration was for commercial purposes rather than experimentation and, as a matter of law, the Gopher Zapper was in public use more than one year prior to the date of the 636 patent application.  Because the public use of the Gopher Zapper was established, any possible factual dispute as to whether the Gopher Zapper was on sale at the trade show is precluded by the fact that the § 102(b) bar requires only either a "public use" or "on sale" activity.

Nevertheless, the Gopher Zapper is not the same invention as the Rat Zapper, which is the claimed invention of the 636 patent.  For the § 102(b) bar to apply the differences between the

Rat Zapper and the Gopher Zapper have to be obvious to a person having ordinary skill in the pertinent art.  See Corcoran, 640 F.2d at 1333.  Obviousness is a question of law.  Graham v. John Deere Co., 383 U.S. 1, 17 (1966).  A legal conclusion that a claim is obvious based on the prior art, however, depends on four underlying factual issues: (1) the scope and context of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) the evaluation of any relevant secondary considerations, such as commercial success, long felt but unresolved needs, failure of others, etc.  Id.

Here, Woodstream argues that the substitution of using a resistive electrical switch in the Rat Zapper instead of the mechanical pressure switch of the Gopher Zapper is an obvious difference to a person of ordinary skill in the pertinent art.  Woodstream claims that there are no genuine issues of material fact underlying the determination of obviousness.  This Court disagrees.  The scope and context of the prior art, the differences between the Gopher Zapper, other relevant prior art, and the Rat Zapper, and the level of ordinary skill in the pertinent art are still in dispute.  Without these factual determinations resolved, this Court cannot as a matter of law state that the 636 patent is obvious over the Gopher Zapper.

Woodstream cites the Patent Examiner's rejection of the 636 patent application as proof that there is no dispute over obviousness and that it should be granted judgment as a matter of law on this issue.  The Patent Examiner concluded that the 636 patent is obvious over the 091 patent in combination with other prior art.  The Gopher Zapper is merely the commercial embodiment of the 091 patent.   The Patent Examiner stated that:

> Claims 1-24 are rejected under 35 U.S.C. 103(a) as being unpatentable over Johnson et. al [the 091 patent] [i]n view of Dye and Madsen [other patents].
> Johnson et. al teach all the salient features of what is claimed, save

> the resistive switch.
> Dye teaches the use of electrodes to sense and electrocute the pest.
> Madsen teaches the use of the high voltage and ground electrodes
> to both sense and apply voltage to the load.
>
> Thus it would have been obvious to one having ordinary skill in the art at the time
> that the invention [Rat Zapper] was made to modify Johnson et al. per the
> teachings of Dye and Madsen so as to be able to electrocute a pest using the high
> voltage and ground electrodes, thus in effect using a resistive switch to do so.

(WSJ Ex. 3, at 000240).  Thus, the Patent Examiner rejected the 636 patent application as

obvious in light of the 091 patent and other prior art.  He rejected the patent application "under

the judicially created doctrine of obviousness-type double patenting as being unpatentable over

claims 1-18 of U.S. Patent No. 5,269,091 in view of DYE and MADSEN.  The patent claims

differ in the type of sensor used to effect the electrocution.  DYE and MADSEN are applied

above and hence to change the type of sensor to effect the electrocution is obvious to those of

ordinary skill in the art."  (Id. at 000240-000241).  A patent application is rejected under the

doctrine of obviousness-type double patenting when a patent is "merely an obvious variation of

an invention disclosed and claimed in an earlier patent by the same inventor."  Georgia-Pacific

Corp. v. U.S. Gypsum Co., 195 F.3d 1322, 1326 (Fed. Cir. 2000).  Here, the Patent Examiner

viewed the Rat Zapper as just an obvious variation of the Gopher Zapper.

Nevertheless, Agrizap was able to have the 636 patent successfully issued.  To do so and

overcome the obviousness-type double-patenting rejection, Agrizap used a terminal disclaimer.

Obviousness-type double patenting can be overcome by filing a terminal disclaimer.  Ortho

Pharm. Corp. v. Smith, 959 F.2d 936, 940 (Fed. Cir. 1992).  A patent owner can file a disclaimer

to relinquish certain legal rights to his or her patent.  Id.  This disclaimer is a "[v]oluntary

limitation of the term of the later-issued patent" and "is a convenient response to an obvious-type

double patenting rejection, when the statutory requirement of common ownership is met." <u>Quad Envtl. Techn. Corp. v. Union Sanitary District</u>, 946 F.2d 870, 873 (Fed. Cir. 1991).  Agrizap corrected the inventorship of the 636 patent so that both patents had the same inventors, thus, it was then able to disclaim the terminal portion of the 636 patent which would extend beyond the expiration date of the 091 patent.  This terminal disclaimer overcame the obviousness-type double-patenting rejection, thereby securing the withdrawal of the 091 patent as prior art, and leading to the eventual issuing of the 636 patent.

The crux of Woodstream's argument is that because the 091 patent renders the 636 patent obvious, then so does the 091 patent's commercial embodiment the Gopher Zapper.  Even though the 091 patent was no longer prior art rendering the Rat Zapper obvious after Agrizap's terminal disclaimer, the 091 patent's commercial embodiment, the Gopher Zapper, still remained as prior art through its public use in violation of § 102(b).   Thus, if the Patent Examiner had known of the prior art of the Gopher Zapper in public use more than one year prior to the 636 patent application, he would have still rejected the 636 patent as obvious for the same reasons.

Agrizap presents competing evidence as to the interpretation of the scope and context of the prior art, the differences between the Gopher Zapper, other relevant prior art, and the Rat Zapper, and the level of ordinary skill in the pertinent art.  Co-inventor William Johnson and Agrizap's expert, Barry Feinberg, Ph.d., P.E., a professional engineer, have competing interpretations of the facts at issue.  Johnson states that "the references cited by the examiner do not teach all the limitations for the claimed invention and assuming, for argument sake alone, that they did, there is no suggestion to combine these teachings."  (William Johnson Declaration ("Johnson Dec."), at ¶ 12).  Dr. Feinberg presents different factual evidence as to the differences

between the prior art and the 636 patent:

> The claimed language focuses on a "sensing the presence of one of said pests as a resistive body" and "resistive switch means." Dye does not teach this element. Instead, Dye teaches that, "when a rodent 32 is present between the sleeve 15 and ring 14 the proper bias is applied to cause transistor 19 to conduct, when transistor 19 conducts is cause transistor 20 to conduct . . ." (Col. 2, lines 59-63). Dye does not disclose sensing the pest as a resistive body, but instead activates by causing transistor 19 to conduct. Madsen discloses "The detecting or load sensing circuit in the apparatus according to the present invention will automatically establish whether an external load exists between the output terminals or electrodes." (Col. 1, lines 59-61). There is no mention of a resistive switch or sensing the presence of a resistive body. There is also no mention of this being used in a pest electrocution system. Based on the above analysis, it is my Professional Engineering opinion that even if the Gopher Zapper were prior art (which has not been established) the claims in the '636 patent would not be obvious in light of Madsen and Dye.

(Barry Feinberg Expert Report ("Feinberg Report"), at 20). Dr. Feinberg also addresses the factual issue of the necessary level of ordinary skill in the pertinent art to have made this obviousness determination at the time the invention was made. In his report, he explains how one of ordinary skill in the art would not be "motivated to utilize the teachings of these prior art patents to evolve the totality of the invention claimed in claim 1 of the '636 patent." (Id., at 16).

Woodstream's factual basis for obviousness essentially consists of the Patent Examiner's decision. The Patent Examiner's decision on a patent application is never binding on the court, but rather is evidence the court considers in determining whether the party asserting invalidity has met its statutory burden by clear and convincing evidence. Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1555 (Fed. Cir. 1985). In addition, it is important to note that a terminal disclaimer simply serves the function of removing an obviousness-type double patenting rejection and neither raises a presumption nor estoppel on the merits of the obviousness rejection. Quad, 946 F.2d at 874. This Court cannot assume that Agrizap's use of the terminal disclaimer

equals an admission that the Rat Zapper is obvious over the Gopher Zapper or prevents Agrizap from continuing to challenge the claim that the 636 patent is obvious over the prior art.

Moreover, Agrizap provides the statements of Johnson, one of the inventors of both the Rat Zapper and the Gopher Zapper, and Dr. Feinberg, its technical expert, to challenge the underlying factual issues of obviousness. Thus, whether the 636 patent is obvious over the prior art of the Gopher Zapper in public use cannot be resolved as a matter of law and this Court cannot determine whether § 102(b) applies or not. Without determining whether § 102(b) applies, this Court cannot determine if the public use of the Gopher Zapper was prior art, which prevents this Court from making a judgment on whether this information is material or not.

In addition, while it is not disputed that Agrizap did fail to inform the PTO of this public use of the Gopher Zapper at the trade show, there are still underlying factual issues in dispute as to whether Agrizap failed to inform the PTO of this public use with an intent to deceive. Woodstream argues that summary judgment is appropriate on the issue of intent because Agrizap withheld highly material information in the form of the Gopher Zapper prior art; the record established that Agrizap knew of this information and knew, or should have known, of its materiality; and Agrizap has no credible explanation for withholding. See Ferring B.V., 437 F.3d at 1191 (stating requirements for summary judgment on issue of intent). Co-inventors William Luther and Robert Noe and Agrizap's Operations Manager Patrick Frape, manned the booth at the trade show where the Gopher Zapper was demonstrated. (Frape Dep. Tr., at 7-8, 15, 30, WSJ Ex. 9; Noe Dep. Tr., at 239-44, WSJ Ex. 14). Johnson, Noe, and Luther attended Agrizap's shareholder meeting a few weeks after the trade show where the trade show was discussed. (Minutes of Annual Meeting, April 21, 1993, WSJ Ex. 8; Frape Dep. Tr., at 19-24, WSJ Ex. 9;

27

Luther Deposition Transcript ("Luther Dep. Tr."), at 25-27, WSJ Ex. 12; Noe Dep. Tr., at 237, WSJ Ex. 14).  Johnson, being a registered patent attorney, knew or should have known of the materiality of the public use of the Gopher Zapper as prior art under §102(b), even though the 091 patent was removed as prior art.  (WSJ Ex. 3, at 000243-44, 000261-62; Johnson Dep. Tr., at 18-19, 22-23, WSJ Ex. 13).  Therefore, according to Woodstream, Agrizap knew of the materiality of this information and has no credible explanation for not informing the Patent Examiner about this information.

On the other hand, Agrizap argues that Woodstream failed to present any evidence showing an intent to deceive by clear and convincing evidence.  According to Agrizap, Woodstream's evidence shows nothing more than the fact that the Gopher Zapper was demonstrated by Agrizap at the trade show.  Johnson did not attend this trade show and did not know the demonstration took place.  (Johnson Dec., at ¶¶ 5 & 11).  Noe is neither a patent attorney nor a patent law expert and did not understand how a one time demonstration of an already patented Gopher Zapper could be relevant to the patentability of the Rat Zapper invention of the 636 patent.  (Noe. Dec., at ¶ 12).  Thus, Agrizap has a credible explanation and summary judgment cannot be granted on the intent issue.

It is clear that there are genuine issues of material fact underlying whether the Rat Zapper is obvious over the alleged prior art of the public use of the Gopher Zapper; whether § 102(b) is applicable  and thus whether the public use of the Gopher Zapper is prior art; whether Agrizap's failure to inform the PTO of the public use of the Gopher Zapper at the trade show is material; and whether Agrizap had an intent to deceive the PTO.  These issues prevent this Court from concluding as a matter of law that Agrizap committed inequitable conduct rendering the 636

patent unenforceable.

Woodstream also has a second inequitable conduct argument.  It argues that Agrizap committed inequitable conduct when Agrizap had one of the true co-inventors, Bruno Rist, removed as an inventor to deceive the PTO.  Agrizap hired Bruno Rist as a consultant and he was provided with a working Gopher Zapper and resistance switch circuit board design.  He was to test the resistance switch circuit board, which occasionally malfunctioned, and to help make a more reliable design.  Rist was named as a co-inventor on the original 636 patent application along with Johnson and Luther.

After the Patent Examiner rejected the 636 patent as explained above, Johnson took over as counsel for the patent's prosecution.  He changed the inventorship of the 636 patent by removing Rist and adding Robert Noe.  With this change in inventorship, the 636 patent and the 091 patent have the same inventors.  Because both patents have the same inventors, Agrizap was allowed to use the terminal disclaimer procedure as explained above.  This disclaimed the terminal portion of the 636 patent that would extend beyond the expiration date of the 091 patent and thus removed the original patent, the 091 patent, as prior art.   The PTO accepted this terminal disclaimer on March 16, 1999.  The following day, the 636 patent was issued.  Essentially, Woodstream's argument is that Agrizap removed Rist solely so that it could have the same inventors on both patents and take advantage of the disclaimer procedure.

A genuine issue of material fact exists with respect to the inventorship of the 636 patent.  The extent to which Rist worked on the 636 patent and what he did or did not develop is a material factual issue that remains in dispute.  To be a joint inventor, a person must: (1) contribute in some significant manner to the conception or reduction to practice of the invention;

29

(2) make a contribution to the claimed invention that is not insignificant in quality when that contribution is measured against the dimension of the full invention; and (3) do more than merely explain to the real inventors well-known concepts or the current state of the arts.  Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998).

Woodstream claims that Rist is a co-inventor of the 636 patent because of his contribution to the conception and reduction of practice of the Rat Zapper, while Agrizap claims that Rist only helped to work out a problem with the circuit board of the Gopher Zapper. Woodstream argues that Rist's contributions to the circuitry of the 636 patent were significant. According to Woodstream, Rist evaluated the Gopher Zapper and recognized that the mechanical switches need to be replaced with a solid state product (Rist Deposition Transcript ("Rist Dep. Tr."), at 16-17, 27-28, WSJ Ex. 10); Rist prepared circuit drawings for Agrizap that are identical to Figure 5 of the 636 patent (Rist Dec., at ¶ 4, WSJ Ex. 11); Rist alone conceived and originated this circuitry (Id.); Rist supplied a physical "bread board" circuit to Agrizap (Rist Dep. Tr., at 41-42, 44, WSJ Ex. 10); Rist originated the multivibrator used to generate the high voltage (Rist Dep. Tr., at 34-35, WSJ Ex. 10); Rist contributed to and was at least a co-inventor on the generating of high voltage and current across the high voltage and reference electrodes, which electrodes were also used for sensing the presence of the pest (Rist Dep. Tr., at 29-35, 88-92, WSJ Ex. 10); and he was at least the co-inventor on the subject matter of claims 9 and 20, namely the generator comprising a multivibrator and flyback transformer (Rist Dep. Tr., at 34-35, WSJ Ex. 10; Johnson Dep. Tr., at 63-66, WSJ Ex. 13).

On the other hand, Agrizap argues that the evidence shows that Rist did not make a contribution to the 636 patent, but only served as a consultant to assist with the Gopher Zapper's

reliability problem.  Furthermore, Agrizap claims that Rist could not have contributed to the Rat

Zapper's circuitry because: the mechanical switches had been replaced with resistive switches

prior to the time Rist began working for Agrizap (Noe. Dec., at ¶ 6, Frape Dec., at ¶ 7, Johnson

Dec., at ¶¶ 7,10); Rist did not design the circuitry and the other specific parts of the invention

explained above as Woodstream claims but rather it was designed previously by Bill Johnson and

Robert Noe (Noe Dec., at ¶¶ 5-6, Frape Dec., at ¶ 9, and Johnson Dec., at ¶¶ 7,10); Rist was

informed by Agrizap's original attorneys that he was named inventor strictly for administrative

ease (Rist Dep. Tr., at 53, WSJ Ex. 10); Rist never challenged Agrizap's original attorney's

opinion that his contribution may not rise to the level of inventive contribution (Id.); Rist did not

know the 636 patent existed until he was contacted by Woodstream regarding his deposition

(Rist Dep. Tr., at 29, WSJ Ex. 10); Rist claimed he had no documents or material related to his

work (Rist Dep. Tr., at 61, WSJ, Ex. 10); and Rist's contributions to the design were limited to

conventional applications of known principals such as diode protection of switching components

(Johnson Dec., at ¶ 9). Therefore, there is a factual dispute over the extent of Rist's contribution

or lack thereof to the 636 patent and this Court cannot determine if he is a joint inventor as a

matter of law.

    A factual dispute also remains as to why Rist was removed as an inventor and replaced by

Noe.  Woodstream contends that Agrizap wrongfully removed him as an inventor and replaced

him with Noe solely so that it could deceive the PTO into improperly issuing the 636 patent.

Woodstream claims from the circumstances surrounding the removal of Rist, Agrizap had an

intent to deceive the PTO.  Because intent need not and can rarely be proven by direct evidence,

it "must generally be inferred from the facts and circumstances surrounding the applicant's

overall conduct." Elk Corp. Of Dallas v. Gaf Bldg. Materials Corp., 168 F.3d 28, 32 (Fed. Cir.

1999).  On the other hand, Agrizap claims that Rist was erroneously named as a co-inventor on

the original application by its prior counsel, and the removal was solely to correct this mistake.

In his declaration, Johnson stated that:

> Rist was named as an inventor on the second patent, No. 5,949,636, but this was
> an error by Agrizap's former counsel, Irell and Manella.  When the application
> was filed I was not aware that Bruno Rist was a named inventor.  William Luther
> and I signed a declaration in support of the patent application, and I later
> discovered that Bruno Rist had signed a separate declaration.  At the time the
> application was filed I was not provided with a copy of Bruno Rist's declaration
> or informed that he was a named inventor.  I am not certain why they named Rist,
> because as I have already testified, Rist was hired simply to work out the problem
> with the already-designed circuit board, which malfunctioned in some but not all
> of the tests.  After I took over representation for the company, I corrected the error
> in which Rist was named, and substituted the true inventor, Noe.  The improper
> naming of Rist by Irell and Manella was an error, and was not reflective of the
> true inventorship of the patent.

(Johnson Dec., at ¶ 8).  Woodstream rebuts that Johnson's statement is nothing more than a

mere denial that is inconsistent with its evidence that he did know that Rist was a true co-

inventor.  See Paragon, 984 F.2d at 1189 ("[M]erely conclusory statements or completely

insupportable specious, or conflicting explanations or excuses will not suffice to raise a genuine

issue of fact.").  Woodstream cites the Assignment filed by Agrizap with its original application

that contained the signatures of Johnson, Luther, and Rist as the Rat Zapper's inventors.  (WSJ

Ex. 15).  Johnson and Luther signed the Assignment one day after Rist signed it.  (Id.).

Woodstream also cites a fax from Irell & Manella to Johnson, dated November 2, 1994, that

seems to indicate that Johnson knew of Rist being named as an inventor in advance to him taking

over as counsel for the patent's prosecution.  (WSJ Ex. 16).  Johnson's statements, however, are

more than a mere, and possibly contradictory denial, but rather they are a rational explanation for

the change in inventorship.   Therefore, the trier of fact will have to decide if the removal of Rist was done with an intent to deceive the PTO or just done to correct a mistake.

There are genuine issues of material fact as to whether Rist was a true co-inventor and as to whether he was removed as an inventor deceptively or honestly.  With these facts in dispute, this court cannot find as a matter of law that Agrizap committed inequitable conduct by removing Rist as an inventor during the 636 patent's prosecution.  In conclusion, summary judgment cannot be granted on either grounds of inequitable conduct.

### 2.      Incorrect Inventorship

Woodstream argues that the 636 patent is invalid because of incorrect inventorship.  Even if the removal of Rist was not done with an intent to deceive or mislead, Woodstream still claims that the 636 patent is invalid because without Rist listed as a co-inventor the inventorship of the 636 patent is erroneous.  "A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented."  35 U.S.C. § 102(f).  Thus, a patent must accurately list the correct inventors of a claimed invention.  Pannu, 155 F.3d at 1349.  Furthermore, "if nonjoinder of an actual inventor is proved by clear and convincing evidence, a patent is rendered invalid."  Id.  Once again, this legal issue can only be resolved based on whether Rist is a true co-inventor or not.  As stated above, Rist's status as an inventor is a matter of factual dispute between the parties.  Therefore, summary judgment cannot be granted on this issue either.

### 3.      Claim Invalidity

Woodstream argues that summary judgment should be granted on the ground that the 636 patent is invalid because Claim 1 of the 636 patent and all dependant claims are invalid under 35 U.S.C. §§ 101, 112, and 132.   Claim 1, subsection (d), of the 636 patent states that:

"deactivating said generator only upon expiration of said predetermined time period or in response to a reset signal."  Woodstream argues that there is no description or disclosure in the 636 patent specification of deactivating the generator in response to a reset signal prior to the expiration of the predetermined time period.  Woodstream has three separate legal arguments upon which it claims that Claim 1 is invalid.

First, Woodstream contends that the 636 patent application, as originally filed, contained no written description of how the invention deactivates the generator in response to a reset signal. This language of Claim 1(d) pertaining to deactivation in response to a reset signal was added later by an amendment to the patent application.  Therefore, Woodstream alleges that Agrizap violated the written description requirement of 35 U.S.C. § 112 that states that "the specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same."  In addition, this pertinent language of Claim 1(d) is an alleged violation of 35 U.S.C. § 132(a) that states that "[n]o amendment shall introduce new matter into the disclosure of the invention."  "Both [of these statutory requirements] serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date."  Turbocare Div. of Demag DeLaval Turbomachinery Corp. v. General Electric Co., 264 F.3d 1111, 1118 (Fed. Cir. 2001).   Because there was no description in the original application that described a reset signal that could deactivate the generator in advance of the predetermined time period, this language is new matter that could not be added by amendment.

Second, Woodstream argues that Claim 1 fails to enable a person skilled in the art to make or use the invention and Claim 1 is inoperable because there is no disclosure in the patent

specification of how to carry out a method of deactivating the generator upon a reset signal. 35 U.S.C. § 112 requires that the disclosure in the specification enable any person skilled in the art to make or use the invention. In addition, if a claim fails to adequately disclose how to carry out a process, the claimed invention must be inoperable, which is a violation of the utility requirement of 35 U.S.C. § 101. In re Swartz, 232 F.3d 862, 863 (Fed. Cir. 2000); Process Control Corp. v. Hydreclaim Corp., 190 F.3d 1350, 1358 (Fed. Cir. 1999). "Thus, if the claims in an application fail to meet the utility requirement [of 35 U.S.C. 101] because the invention is inoperable, they also fail to meet the enablement requirement [of 35 U.S.C. 112] because a person skilled in the art cannot produce the [inoperable] invention." Swartz, 232 F.3d at 863.

Third, Woodstream claims that Claim 1 is indefinite in violation of the definiteness requirement of 35 U.S.C. § 112 because the reset signal was never clearly explained in the specification. 35 U.S.C. § 112 requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of a claim when the claim is read in light of the rest of the specification." Union Pacific, 236 F.3d 684, 692 (Fed. Cir. 2001). "Reset signal" appears in both Claim 1(d) and 1(e). According to Woodstream, while on its face the reset signal terms in both subsections refer to the same reset signal, the specification never explains a reset signal that both deactivates the generator as set forth in 1(d) and re-enables the triggering step as set forth in 1(e).

Woodstream also argues that dependant Claim 2 is indefinite because it contains the phrase "said manual reset" that has no antecedent basis. "The requirement of antecedent basis is

35

a rule of patent drafting, administered during patent examination." Energizer Holdings, Inc. v. Int'l Trade Comm'n, 433 F.3d 1366, 1370 (Fed. Cir. 2006). A lack of antecedent basis, however, does not render a claim invalid for indefiniteness, if "the meaning of the claim would reasonably be understood by a person of ordinary skill when read in light of the specification." Id.

Summary judgement cannot be granted on Woodstream's claims that Claim 1 and its dependant claims are invalid. With respect to the written description requirement of 35 U.S.C. 112, determining compliance with this requirement is a question of fact. Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563 (Fed. Cir. 1991). While Woodstream contends there is no factual dispute that the specification does not contain a written description of how a reset signal could deactivate the generator in advance, Agrizap provides sufficient competing evidence. According to Dr. Feinberg, Agrizap's technical expert, "the specification in the '636 patent clearly gives a full description of how a reset signal would deactivate the high voltage and current generator." (Feinberg Report, at 15). He cites column 8, lines 5-10 of the 636 patent specification which state that:

> [t]he reset input of the Timer Chip 18 is held briefly low by signal POR 97 until capacitor 26 is charged through resistor 19, thereby resetting output PTIME 95 of Timer Chip 18 to a low state (i.e. logic 0). The inactive state of PTIME 95 also resets Timer Chip 34 causing its output POUT 35 to assume a low state as well.

(Id.). Dr. Feinberg's interpretation of the specification is that when POUT 35 assumes a low state, the high voltage and current generator is deactivated. (Id.). Therefore, there is a genuine issue of material fact as to whether the specification contains the requisite written description of how a reset signal can deactivate the generator. Moreover, because §132(a) is a corollary to the written description requirement of § 112, Turbocare, 264 F.3d at 1118, this Court also cannot

36

determine if § 132(a) has been complied with at this time.

The utility requirement of 35 U.S.C. § 101 and the enablement requirement of 35 U.S.C. § 112 are "closely related grounds of unpatentability."  Process Control, 190 F.3d at 1358. Utility is a question of fact, id. at 1359, while enablement is a question of law.  Union Pacific, 236 F.3d at 690.  Dr. Feinberg provides a competing analysis as to whether the specification discloses if the invention carries out the process of deactivating the generator by a reset signal. Thus, a genuine issue of material fact remains as to utility.  Because utility and enablement are so closely interconnected, this genuine issue of material fact prevents the Court from having the necessary factual underpinnings to decide enablement as a matter of law.  See id. ("As is often true of legal questions, however, the ultimate legal conclusion of enablement rests on factual underpinnings.").

Lastly, this Court cannot grant summary judgment to Woodstream on its arguments of claim indefiniteness.  A determination of whether a claim is indefinite under § 112 is a question of law related to the Court's claim construction duty.  N. Am. Vaccine, Inc. v. Am. Cyanamid Co., 7 F.3d 1571, 1579 (Fed. Cir. 1993).  "A claim that is amenable to construction is not invalid on the grounds of indefiniteness."  Energizer, 435 F.3d at 1371.  The reset signal terms in Claim 1(d) and 1(e) and the manual reset term in Claim 2 have been defined in the above Claim Construction section.  This Court was able to determine the definition and scope of those terms based on the ordinary and customary meaning of those terms, the context of the surrounding words of the claims, and the specification as a whole.  Therefore, this Court cannot grant summary judgment because these claims were amenable to claim construction and Woodstream is not entitled to judgment as a matter of law on the question of claim indefiniteness.  In

conclusion, summary judgment is denied on all Woodstream's alleged grounds of claim invalidity.

### 4.  Obviousness

Woodstream contends that the 636 patent is invalid for obviousness over the alleged prior art of the public use of the Gopher Zapper.  Obviousness was addressed above within the discussion concerning the inequitable conduct defense.  As stated above, factual disputes between the parties remain on this question and this Court cannot grant summary judgment on the grounds of obviousness.

## IV.  <u>CONCLUSION</u>

In conclusion, genuine issues of material fact remain in dispute and Woodstream is not entitled to judgment as a matter of law on the grounds of patent unenforceability and invalidity. Thus, Woodstream's Motion for Partial Summary Judgment is denied.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

AGRIZAP, INC.,                                    :           CIVIL ACTION
                                                  :
              Plaintiff,                          :
                                                  :
       v.                                         :           No. 04-3925
                                                  :
WOODSTREAM CORPORATION, et al.,                   :
                                                  :
              Defendants.                         :
_____:


**O R D E R**

     **AND NOW** this  12th  day of May, 2006, upon consideration of the Motion for Partial

Summary Judgment on Grounds of Patent Unenforceability and Invalidity of Defendant

Woodstream, and the Responses and Replies thereto, it is hereby **ORDERED** that the Motion for

Partial Summary Judgment by Woodstream (Doc. No. 58) is **DENIED**.

                                                     BY THE COURT:


                                            /s/ Robert F. Kelly_____
                                            ROBERT F. KELLY,                    Sr. J.