**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
AGRIZAP, INC.,                          :          CIVIL ACTION
                                        :
                    Plaintiff,          :
                                        :
          v.                            :          No. 04-3925
                                        :
WOODSTREAM CORPORATION, et al.,         :
                                        :
                    Defendants.         :
_____:

<u>**MEMORANDUM**</u>

**ROBERT F. KELLY, Sr. J.**                                **AUGUST 23, 2006**

      Presently pending before this Court is Defendant Woodstream Corporation's

("Woodstream") Motion for Partial Summary Judgment on Plaintiff Agrizap, Inc.'s ("Agrizap")

state law claims.  For the following reasons, Woodstream's Motion is granted in part and denied

in part.

**I.**    <u>**BACKGROUND**</u>

      In 2000, Woodstream contacted Agrizap about the possibility of the two parties entering

into a marketing and distribution agreement for Agrizap's Rat Zapper Product.  The Rat Zapper

is a consumer product that consists of a plastic canister with a metal plate at the bottom and an

electrical charge which ultimately kills the rodent.  The two parties engaged in negotiations from

April 2000 to the fall of 2000.

      During this time period, Woodstream sent samples of the Rat Zapper to an offshore

Chinese manufacturer that prepared and sent to Woodstream a cost evaluation report breaking

down the cost of the Rat Zapper by its components.  On August 15, 2000, Robert G. Noe,

President of Agrizap, wrote an e-mail to Andy Woolworth, Executive Vice President of

Woodstream, in which he expressed concern about the Rat Zapper being sent overseas for cost

evaluation.  Noe wanted Woodstream's assurance that this action was covered by the Mutual

Confidentiality Agreement the parties signed in May 2000 and that there would be no attempt to

"clone" the Rat Zapper.  (Woodstream's Mot. Partial Summ. J., Ex. E).  In this e-mail, Noe also

expressed that he "was hoping at this time, to be further along with [the] relationship."  (Id.).  On

August 24, 2000, Woolworth sent an email to Noe saying he shares his frustration that the

"relationship has progressed slowly."  (Id., at Ex. G).  Woolworth then said:

> Let[']s stop dwelling on what we do not agree on and develop a relationship on
> what we agree on: Woodstream's distribution strengths and your high quality
> product.  Why don't we just get started?  We can show you what we can do with
> our distribution clout and you can start enjoying the benefit of higher sales.

(Id.).  Noe responded that he would tell Scott Heaton, Agrizap's Vice President of Sales, to get

back to Woolworth about that proposal.  (Id.).  Noe once again asked for assurance that the

forwarding of the Rat Zapper overseas to an unknown third party for production cost evaluation

fell within the terms and intent of the Mutual Confidentiality Agreement.  (Id.).  Woolworth

responded that the Mutual Confidentiality Agreement covers Noe's concern.  (Id.).

Various proposals and negotiations occurred during the summer of 2000.  After these

discussions, Woodstream issued to Agrizap a first written purchase order on September 19, 2000

for 1080 Rat Zappers.  On September 21 and then again on September 27, Agrizap issued an

invoice to Woodstream acknowledging shipment of portions of that order.  In the fall of 2000,

Woodstream sent Agrizap a copy of its Victor Launch Plan.  (Robert G. Noe Decl., at 000001-

000008).  The Launch Plan was an overview of the objectives of the business relationship

between Woodstream and Agrizap.

Thereafter, for a little less than three years, Agrizap manufactured and delivered Rat Zappers with Woodstream labels to Woodstream. Woodstream would then distribute the Rat Zappers to various retailers. The above-mentioned pattern of a written purchase order followed by a confirming invoice continued during the period of September 19, 2000 through July 6, 2003. It is undisputed that Woodstream paid for all of these invoices timely and in full.

According to Agrizap, in early 2004, Agrizap discovered that Woodstream was manufacturing and marketing its own electronic rat trap. Agrizap claims that Woodstream used its technology and infringed the Rat Zapper patent to develop its own electronic rat trap. Agrizap also asserts that confusion in the retail market developed because of Woodstream's branding of the Agrizap Rat Zapper and because of Woodstream's newly introduced electronic rat traps. Agrizap asserts that if this continued, Woodstream would effectively undermine Agrizap's ability to sell its goods in the market.

Based on these allegations, Agrizap filed suit against Woodstream. Agrizap's second Amended Complaint contains the following five counts against Woodstream: Violation of California's Unfair Business Practices Laws & Professions Code (Count I); Breach of an Oral Contract (Count II); Patent Infringement (Count III); Intentional Misrepresentation (Count IV); and Trade Disparagement (Count V). Woodstream's present Motion for Partial Summary Judgment addresses the state law claims encompassed by Count I, II, IV, and V. On July 11, 2006, this Court granted Woodstream's Motion to Strike certain materials submitted by Agrizap in its opposition to this present Motion for Partial Summary Judgment. These materials deemed inadmissible are: Declaration of Donald Gunn, Declaration of Stephanie O'Neill, Doc. No.

W1674, Declaration of Robert G. Noe ¶¶ 12-13 and Doc. Nos. 000049-000078 attached thereto.

For the following reasons, summary judgment is granted on the California Unfair Business

Practices Laws & Professions Code claims, the trade disparagement claim, and the breach of

contract claim; however, summary judgment is denied for the intentional misrepresentation

claim.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is appropriate when, after considering the evidence in the light most

favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the

moving party is entitled to judgment as a matter of law.'" <u>Hines v. Consol. Rail Corp.</u>, 926 F.2d

262, 267 (3d Cir. 1991)(citations omitted).  The inquiry is "whether the evidence presents a

sufficient disagreement to require submission to the jury or whether it is so one-sided that one

party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52

(1986).  The moving party carries the initial burden of demonstrating the absence of any genuine

issues of material fact.  <u>Big Apple BMW, Inc. v. BMW of N. Am. Inc.</u>, 974 F.2d 1358, 1362 (3d

Cir. 1992).  "A fact is material if it could affect the outcome of the suit after applying the

substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must

be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"

<u>Compton v. Nat'l League of Prof'l Baseball Clubs</u>, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998),

<u>aff'd</u>, 172 F.3d 40 (3d Cir. 1998)(citations omitted).  Once the moving party has produced

evidence in support of summary judgment, the non-moving party must go beyond the allegations

set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue

of fact for trial.  <u>See</u> <u>Big Apple BMW</u>, at 1362-63.  Summary judgment must be granted "against

4

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**III.    DISCUSSION**

      **A.    Preemption of State Law Claims by Federal Patent Law**

Woodstream initially argues that Agrizap's state law claims, except for the trade disparagement claim, are preempted by federal patent law.  According to Woodstream, these state law claims derive from the same core allegation that Woodstream broke its assurance to Agrizap that it would not clone the Rat Zapper.  Woodstream states that Agrizap's "no cloning" allegation simply means that Woodstream promised not to infringe Agrizap's patent.  Thus, Agrizap is merely recasting its patent infringement claim as a breach of contract claim, an intentional misrepresentation claim, an unfair trade practices claim, and unfair competition claim.

State law can be preempted by federal law in one of three ways: (1) by explicit preemption by Congress, (2) by field preemption, or (3) by conflict preemption.  Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1332 (Fed. Cir. 1998).  Here, the type of preemption at issue is conflict preemption.  For conflict preemption to apply, the state law actions must frustrate the accomplishment and execution of the full purposes and objectives of Congress.  Id. at 1335.  "In general, patent law will not pre-empt state law claims, if they include additional elements not found in the federal patent law cause of action and if they are not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law."  Robert L. Harmon, Patents and the Federal Circuit, § 1.4(c) (7th ed. 2005).

Here, Agrizap is using these state law claims in conjunction with and not in opposition to

its rights under federal patent law.  Cryovac Inc. v. Pechiney Plastic Packaging Co., No. 04-1278, 2006 WL 126220, *9 (D. Del. Apr. 17, 2006).  While whether Woodstream infringed Agrizap's Rat Zapper patent does relate to its state law claims, Agrizap has to prove additional elements beyond the infringement to prove its alleged California Business & Professions Code violations, its breach of contract claim, and its intentional misrepresentation claim.  See id. (stating that no conflict preemption because plaintiff must prove more than just willful infringement to prove its tortious interference with contract and prospective business relations claim).  For example, Agrizap would have to prove an existence and breach of a contract, an intentional misrepresentation, or an unfair trade practice.  Therefore, these state law claims are not preempted by federal patent law because they are more than just a parallel way of enforcing Agrizap's patent rights.

B. **California's Business & Professional Code Claims**

Agrizap alleges that Woodstream violated California's Unfair Practices Act (Cal. Bus. & Prof. Code § 17000 et seq.) and California's unfair competition laws (Cal. Bus. & Prof. Code § 17200 et seq.).  For both of these claims, there is no evidence to establish any violations by Woodstream.  Therefore, there are no factual disputes for the trier of fact to resolve and summary judgment is granted on these claims.

1. Unfair Practices Act Claim

"The purposes of California's Unfair Practices Act ("UPA") is 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition; by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.'"  Cel-Tech Communications, Inc.

6

v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 539 (Cal. 1999).  This Act proscribes specific

practices that the California legislature has determined to constitute unfair trade practices.  Id.;

see Cal. Bus. & Prof. Code §§ 17040-17051 (specifying prohibited practices under UPA).

Woodstream argues that summary judgment should be granted on this claim because

Agrizap has neither made any allegation nor has any evidence of Woodstream committing an

unlawful practice proscribed under the UPA.  In response, Agrizap asserts that the prohibited

practices are tying arrangements and secret rebates.[1]  (Agrizap's Mem. Opp'n Mot. Partial

Summ. J., at 20).  Agrizap cites the Declaration of Donald Gunn as its factual evidence to show

that there is a genuine issue of material fact as to tying arrangements and secret rebates.  Mr.

Gunn is a manufacturer's representative and worked for a number of years for Agrizap in the

marketing of the Rat Zapper.  (Donald Gunn Decl., at ¶ 1).  Gunn states that someone at Excel

Garden Products told him that Woodstream offered to give Orchard Supply Hardware ("OSH")[2]

$100,000 if OSH continued to purchase Woodstream's products and not carry Agrizap's Rat

Zapper.  (Id., at ¶ 2-3).  Gunn continued by stating that "[d]ue to the $100,000 rebate, OSH said

there was no way they could re-stock the Rat Zapper due to placement of [Woodstream's

products]."  (Id., at ¶ 3).

This Court will not take Gunn's Declaration into consideration because it was ruled

inadmissible when Woodstream's Motion to Strike was granted.  Pursuant to Federal Rule of

Civil Procedure 56(e), "[s]upporting and opposing affidavits shall be made on personal

---

[1]      Tying arrangements, however, are not a prohibited practice under the UPA, but rather, are a
violation of California's Cartwright Act.  Cal. Bus. & Prof. Code § 16727.  Nevertheless, secret rebates are
prohibited under the UPA pursuant to Cal. Bus. & Prof. Code § 17045.

[2]      According to Donald Gunn, OSH is a California-based hardware chain that previously sold
Agrizap's Rat Zapper and then switched to selling Woodstream's electronic rat trap.  (Donald Gunn Decl., at ¶ 2).

knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Evidence submitted with a motion for summary judgment must be reducible to admissible evidence at trial. Williams v. Borough of West Chester, 891 F.2d 458, 466 n.12 (3d Cir. 1989); Robinson v. Hartzell Propeller Inc., 326 F. Supp.2d 631, 645 (E.D. Pa. 2004); see also Edward J. Brunet, Martin H. Redish, & Michael A. Reiter, Summary Judgment: Federal Law and Practice 172 (2d ed. 2000) ("It is clear that the evidence submitted by parties to support or oppose a motion for summary judgment must be admissible under the Federal Rules of Evidence.").  "Thus, the Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial."  Robinson, 326 F. Supp.2d at 645.  For example, hearsay evidence in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, which would be an admissible form.  Id., Williams, 891 F.2d at 466 n. 12.  However, the mere possibility that the hearsay statement will be presented by the out-of-court declarant as a witness testifying at trial does not warrant the consideration of the hearsay in a summary judgment motion.  Bouriez v. Carnegie-Mellon University, No. 02-2104, 2005 WL 2106582, *8 (W.D. Pa. Oct. 28, 2005)

        Here, Gunn's statements about what he was told by Excel and what OSH told Excel are inadmissible hearsay that do not fall within any of the exceptions to the hearsay rule.  See Fed. R. Evid. 801-804.  They are out-of-court statements offered to prove the truth of the matter asserted that Woodstream was offering $100,000 in rebates to purchase its product instead of the Rat Zapper.  Gunn's Declaration also could not be reduced to admissible evidence at trial.  He could

not testify about the secret rebates at trial because these statements would still be hearsay and because he has no personal knowledge of secret rebates.[3]  Therefore, because Gunn's Declaration was the only evidence provided to show any possible Unfair Practices Act violation, summary judgment is appropriate on this claim.

2.    California Unfair Competition Claim

California's unfair competition law is independent of the UPA and other laws.  Cel-Tech, 973 P.2d at 179.  Its purpose is to govern anti-competitive business practices, to protect consumers, and to preserve fair business competition.  Id. at 180.  Unfair competition includes "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  It covers a broad scope of practices and, unlike the UPA, it does not proscribe and enumerate specific prohibited practices.  Cel-Tech, 973 P.2d at 179.  However, while many courts have described the scope of these prohibited activities in sweeping terms, more than mere harm to the plaintiff-competitor must be shown.  Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp.2d 1099, 1121 (C.D. Cal. 2001).

Agrizap claims that Woodstream's unfair and fraudulent activities consisted of Woodstream using Agrizap's Rat Zapper to gain access to the market; stealing the Rat Zapper technology; producing its own electronic rat trap; and substituting its own electronic rat trap for the Rat Zapper to undermine Agrizap's business.  (Agrizap's Mem. Opp'n Mot. Partial Summ. J., at 20).  In addition, Agrizap alleges that the same picture of the Rat Zapper remained on

---

[3]        It is important to note that Agrizap failed to challenge Woodstream's Motion to Strike.  Thus, it made no attempt to argue the admissibility of the now-stricken materials.  The mere possibility that Agrizap could get the declarant from Excel and OSH who originally made these statements to testify at trial is not sufficient for the court to consider these statements for this summary judgment motion.  See Bouriez, 2005 WL 2106582, at *8.

retailers' websites, but the retailers would ship Woodstream products instead; leading to confusion in the marketplace. Agrizap heard from numerous retailers and customers asking why Woodstream's electronic rat trap was delivered instead of the Rat Zapper. Agrizap refers to this substitution as Woodstream's "bait and switch" technique. (Id. at 14). Woodstream argues that summary judgment on this claim should be granted because Agrizap has shown no alleged injury to competition and the public, but rather only to itself.

Agrizap support for these allegations is based on evidence deemed inadmissible by the previously discussed Motion to Strike. The evidence cited is the Declaration of Robert Noe, President of Agrizap, with relevant documents attached, and the Declaration of Stephanie O'Neill, sales manager for Agrizap. (Id.). The attached documents are print outs from third party websites showing that these third parties sold the Rat Zapper. Both declarations contained inadmissible hearsay statements made by retailers and customers. The relevant documents attached to Noe's Declaration are unauthenticated and also hearsay.[4]

Without this evidence, there is no evidence that Woodstream harmed competition or the public. Rather, the only harm that involves genuine issues of material fact is with respect to harm toward Agrizap alone. If Woodstream did actually harm Agrizap by stealing the Rat Zapper technology and infringing its patent, that harm should be appropriately resolved by Agrizap's patent infringement claim, and not by this unfair competition law claim.

---

[4]        Unauthenticated documents may not be considered by a court in deciding a summary judgment motion. 11 James Wm. Moore, et al., Moore's Federal Practice, § 56.14[2][c] (3d ed. 2005); 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure, § 2722 (3d. ed. 1998); Zenith Radio Corp. V. Matsushita Elec. Indus. Co., Ltd., 505 F. Supp. 1125, 1139 (E.D. Pa. 1980).

## C.      Trade Disparagement Claim

Agrizap claims that Woodstream disparaged Agrizap and its products because Woodstream approached retailers and told them that Agrizap was out of business, bankrupt, or otherwise unreliable in production and distribution of the Rat Zapper; that the Rat Zapper was no longer being manufactured; that Agrizap was purchased by Woodstream; and that Woodstream's electronic rat trap was a substituted product for the Rat Zapper.  Woodstream contends there are no genuine issues of material fact because there is no evidence to support any trade disparagement of Agrizap by Woodstream.  This Court agrees with Woodstream.

Agrizap's only support for its trade disparagement claim is from the inadmissible Declaration of Stephanie O'Neill.  O'Neill declares that retailers and customers told her that Woodstream made the above-mentioned trade disparaging statements.  These statements by retailers and customers are inadmissible hearsay.  The retailers and customers are out-of-court declarants whose statements are being used to prove the truth of the matter asserted.  See Fed. R. Evid. 801-802.  Therefore, without O'Neill's Declaration, Agrizap has no evidence of trade disparagement and there are no genuine issues of material fact as to this claim.

## D.      Breach of Contract Claim

Summary judgment is also appropriate on Agrizap's breach of contract claim because there is no evidence of a contract term that Woodstream breached.  Agrizap describes its breach of contract claim broadly in both its second Amended Complaint and its Memorandum in support of its opposition to Woodstream's Motion for Partial Summary Judgment.  In its second Amended Complaint, Agrizap avers that:

Woodstream made representations to Agrizap, which prompted Agrizap to allow

11

Woodstream to brand and market the Rat Zapper under its own "Victor" label, to induce Agrizap to pull out of certain retail markets, and to enter into a comprehensive marketing agreement.  Part of the consideration that induced Agrizap to enter into the contract was Woodstream's assurances that it would act ethically.  In addition, included in the contract was a covenant of good faith and fair dealing, which is inherent in every contract in California.  (Agrizap's Second Am. Compl., at ¶ 25); and

Woodstream thereinafter utilized Agrizap technology and trade secrets to establish the "Victor" labeled Rat Zapper in numerous retail markets, some of which markets had been surrendered by Agrizap as part of its marketing agreement with Woodstream.  Once the "Victor" label Rat Zapper was clearly established, with a good reputation, then Woodstream created its own electronic Victor Mousetrap and Victor Rat Trap, and substituted its products for the Rat Zapper, all the while using Agrizap's trade secrets, in violation of the marketing agreement between the parties.  (Id., at ¶ 26).

In its Memorandum, it states that:

Our case is not concerned with how many Rat Zappers were sold; it has to do with the totality of the circumstances of the Woodstream activities that led to Agrizap's loss of market share and damaged reputation with retailers.  (Agrizap's Mem. Opp'n Partial Summ. J., at 29).

More specifically, Agrizap states that:

Woodstream failed to aggressively market the Rat Zapper, as promised; it actually turned down a 10,000 unit order for the Rat Zapper from Ace Hardware in 2003 (citations omitted).  It used Agrizap technology to gain a foothold in the electronic rodent control market, so that it could substitute its own cloned and competing product (citation omitted).  Then, after its own competing product was ready to sell, it used Agrizap's picture on the ordering websites, and a description of Agrizap's product, while sending its own cloned product once an order had been placed.  (Id., at 27-28).

In summary, Agrizap argues that the contract was breached due to the totality of the

circumstances of Woodstream's activities resulting in damages to its reputation, goodwill, and

profits.  (Agrizap's Second Am. Compl., at ¶ 28).

Because neither performance of the marketing and distribution agreement nor a violation

of an explicit term of the contract is alleged as the breach, Agrizap's claim seems to be based on a breach of the implied duty of good faith and fair dealing present in any contract. Every contract imposes on the parties a duty of good faith and fair dealing in its performance and in its enforcement.[5] Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992) (stating that duty of good faith and fair dealing found in Restatement (Second) of Contracts § 205 has been adopted by Pennsylvania). A similar requirement has been imposed upon contracts within the Uniform Commercial Code ("UCC"). Id. The UCC defines "good faith" as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S.A. § 1201; Somers, 613 A.2d at 1213. Pennsylvania courts applying the UCC definition of good faith generally use common law contract principles.[6] Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 617 n.13 (3d Cir. 1995).

Many courts require that there be a breach of a duty or provision specifically imposed by the contract itself for there to be a breach of the implied duty of good faith and fair dealing. Id. at 617; E. Allan Farnsworth, Contracts, § 7.17 (4th ed. 2004) (stating that "the duty of good faith must be connected to a duty clearly imposed by the contract itself"); Richard A. Lord, Williston

---

[5]      Both Pennsylvania and California law recognize this duty. Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992); Tilbury Constructors, Inc. v. State Comp. Ins. Fund, 40 Cal.Rptr.3d 392, 396 (Cal. Ct. App. 2006). However, Pennsylvania law applies for all of Agrizap's common law state law claims. In diversity cases, federal courts apply the substantive law of the forum state. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). While both parties make passing references to which states' laws apply, no choice of law issue was raised by either party. If the parties do not actually raise and argue a potential conflict between different states' laws, this Court will not raise the issue sua sponte and "the parties are deemed to have acquiesced in the application of the law of the forum." Keles v. Yale Univ., 889 F. Supp. 729, 733 (S.D. N.Y. 1995); see also Gonzalez v. Volvo of Am. Corp., 752 F.2d 295, 299 (7th Cir. 1985); Protective Ins. Co. v. Montgomery Tank Lines, Inc., No. 89-2793, 1989 WL 152527, *2 (N.D. Ill. Dec. 8, 1989). Therefore, Pennsylvania law will apply.

[6]      Agrizap and Woodstream argue over whether the UCC applies to this case. Distributorship agreements are considered sales of goods. See Artman v. Int'l Harvester Co., 355 F. Supp. 482, 486 (W.D. Pa. 1973); Weilersbacher v. Pittsburgh Brewing Co., 218 A.2d 806, 807-8 (Pa. 1966); see also Am. Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1386 (7th Cir. 1995). Therefore, this contract is within the UCC.

on Contracts, § 63.22 (4th ed. 2002) ("[T]he majority of courts declined to find a breach of the implied covenant of good faith and fair dealing absent breach of an express term of the contract.").  "With rare exception, the courts use the UCC good faith requirements in aid and furtherance of the parties' agreement, not to override the parties' agreement for reasons of fairness, policy, or morality."  Duquesne Light Co., 66 F.3d at 617.  Accordingly, the Third Circuit has stated that courts generally use this duty "as an interpretive tool to determine 'the parties' justifiable expectations,' and do not enforce an independent duty divorced from the specific clauses of the contract."  Id.

Agrizap's breach of contract claim seems to be based on its allegations that Woodstream infringed its Rat Zapper patent; developed its own competing electronic mouse and rat traps and substituted them for the Rat Zapper; induced Agrizap to pull out of certain retail markets; and failed to aggressively market the Rat Zapper.  In sum, Agrizap's complaint with Woodstream is that it made a competing product and that it failed to use its best efforts to distribute the Rat Zapper to benefit its own product when it hit the market.  Thus, Agrizap is essentially implying a non-competition term and a best efforts term into the contract.

Neither a non-competition term nor a best efforts term, however, exist either in writing or orally.  Neither of these terms is mentioned in the purchase orders, acknowledging invoices, or the Launch Plan.  Agrizap makes no attempt in its opposition to this motion to identify any such terms or similar agreements made orally between the parties.[7]  Furthermore, there is no evidence to suggest that the marketing and distribution agreement between Agrizap and Woodstream is

---

[7]     Nevertheless, the purchase orders expressly bar modification except by signed writing. (Woodstream's Mot. Partial Summ. J., Ex. H).

14

anything more than an at-will distribution arrangement where Woodstream would submit purchase orders to Agrizap for Rat Zappers and then Woodstream would distribute them to various retail outlets.[8]  The emails provided by both parties only evidence preliminary negotiations.  They contain various proposals and other discussions, but do not show any resulting, formulated marketing and distribution agreement.  The Launch Plan just states Woodstream's marketing objectives.  It states that Woodstream's purpose is to distribute Rat Zappers to various retailers and reach $1 million by 2003.  (Noe Decl., at Doc. Nos. 000004-000005).  This Launch Plan, however, was not released until after the purchase order arrangement began.  It contains no term about not competing against Agrizap, no term of definitive duration for the contract, no term of exclusivity of distribution, and no term about best efforts.  The purchase order/ acknowledging invoice business relationship began on September 19, 2000.  Woodstream sent a written purchase order to Agrizap for Rat Zappers and after they were successfully shipped, Agrizap sent an acknowledging invoice.  (Woodstream' Mot. Summ. J., Ex. H, I).  This pattern continued for almost three years.  (Id. at Ex. J).  Neither the purchase orders nor the acknowledgment invoices contain terms relating to not developing a competing

---

[8]        Agrizap also emphasizes the use of the words "partner" or "partnership" by Woodstream in various discussions and in the Launch Plan to support its breach of contract claim.  (Woodstream's Mem. Opp'n  Mot. Partial Summ. J., at 3-5, 8, 22, 24).  It seems that Agrizap is implying that the distribution arrangement created a fiduciary relationship.  (Agrizap's Mem. Opp'n Mot. Partial Summ. J., at 29) ("This was a partnership, a long term relationship based on the fiduciary duties inherent in every partnership.").  A fiduciary relationship, however, only arises where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other." Penn City Investments, Inc. v. Soltech, Inc., No. 01-5542, 2003 WL 22844210, *10 (E.D. Pa. Nov. 25, 2003).  Here, Agrizap and Woodstream only have a contractual relationship and there is no evidence that would elevate Woodstream's duties under the contract.  Id.  In addition, the use of the word "partner" here did not mean that the two parties created a partnership.  "A partnership is an association of two or more persons to carry on as co-owners a business for profit."  15 Pa. C.S.A. § 8311.  It is undisputed that Agrizap and Woodstream have just a contractual relationship and did not have common ownership of a business and did not share any profits. (Woodstream's Statement of Material Facts, ¶ 22; Agrizap's Statement of Material Facts, ¶ 22).

electronic rodent trap or a best efforts requirement.  (Id. at Ex. H, I).  There is also no indication in any of these documents that this became an exclusive distribution contract.  (Id.).  These purchase orders and invoices are the only evidence of a contractual relationship between the parties and of the extent of that relationship.

Therefore, the evidence supplied by both parties show that Agrizap and Woodstream entered into an at-will distribution agreement that contained no relevant non-competition term or best efforts term.  Woodstream was not prohibited from directly competing against Agrizap. Developing its own product without infringing, or as Agrizap states "cloning," the Rat Zapper patent is not prohibited by law or by this present contract.  However, it is important to note that if Woodstream did infringe the Rat Zapper patent, Agrizap's appropriate remedy is its patent infringement claim.  Any claim that Woodstream induced Agrizap to not sell to certain retail markets and that it did not aggressively market the Rat Zapper is irrelevant because there was no best efforts term.  Moreover, a best efforts term is not implied in this situation because there is no evidence that the parties' formed an exclusive distributorship agreement.  A best efforts term is only implied when there is exclusive dealing between the parties.  See 13 Pa. C.S.A. § 2306(b) ("A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."); Farnsworth, supra, at § 7.17.  Courts will not supply a best efforts term for nonexclusive dealing because "the grantor of the rights does not disable itself from further activity or from granting rights to others."  Id.

Without any alleged violation of a specific clause of the contract, Woodstream did not

16

breach the implied duty of good faith and fair dealing.  See Duquesne Light Co., 66 F.3d at 617 (stating that duty of good faith and fair dealing does not enforce independent duty divorce from specific clause in contract).  There is no factual dispute that Woodstream fully performed its duties under the parties' at-will distribution agreement.  Therefore, there is no evidence of any contract breach and Woodstream is entitled to judgment as a matter of law on this claim.

### E.       Fraudulent Misrepresentation

Lastly, summary judgment will not be granted on Agrizap's intentional or fraudulent misrepresentation claim because a factual dispute exists concerning Woodstream's representation about sending the Rat Zapper overseas for cost evaluation.[9]  To prove intentional or fraudulent misrepresentation, a plaintiff must show: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

While Agrizap alleges six different fraudulent misrepresentations in its second Amended Complaint, at the least it can show a factual dispute concerning Woodstream's representation about sending the Rat Zapper overseas for cost evaluation.  Agrizap avers that "Woodstream

---

[9]        Woodstream argues that Agrizap's fraudulent misrepresentation claim is barred by the "gist of the action" doctrine.  This doctrine's purpose is to maintain the distinction between the theories of contract and tort, and it precludes a plaintiff from recasting an ordinary breach of contract claim into a tort claim.  Air Prods. & Chemicals, Inc. v. Eaton Metal Prods., Co., 256 F. Supp.2d 329, 340 (E.D. Pa. 2003).  When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, courts have to decide whether the "gist" of the plaintiff's claim is contractual or tortious.  Id.  "[A] tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious."  Id.  Woodstream's argument is moot because summary judgment on Agrizap's breach of contract claim was granted in Woodstream's favor.  The gist of action doctrine is inapplicable when there is not both a contract and a tort claim.

representatives, specifically a company vice president, stated to Agrizap that he was sending the Rat Zapper to Woodstream's 'offshore' manufacturer not to clone the Rat Zapper, but to get a better idea of its costing and production challenges.  In truth, Woodstream, was creating its competing and infringing product." (Agrizap's Second Am. Compl., at ¶ 37(a)).  Agrizap twice asked Woodstream for assurance that sending the Rat Zapper to the overseas manufacturer was just for cost evaluation and was within the Mutual Confidentiality Agreement.  (Woodstream's Mot. Partial Summ. J., Ex. E, G).  Agrizap was concerned with the potential for the Rat Zapper to be cloned.  (Id., at Ex. E).  Woodstream's Andy Woolworth assured Agrizap that sending the Rat Zapper overseas to a third party for cost evaluation was within the terms of the Mutual Confidentiality Agreement.  (Id., at Ex. G).  This is the representation at issue.

As for the second prong of fraudulent misrepresentation, whether it was material to the transaction at hand is a matter of factual dispute because the misrepresentation might have effected Agrizap in deciding to enter a business relationship with Woodstream.  As for the third prong, whether it was made falsely, with knowledge of its falsity or recklessness as to whether it is true or false is also a matter of factual dispute.  Certain documents attached to the Declaration of Kate M. Neiswender, lead counsel for Agrizap, could imply that the statement was false and that Woodstream knew it was false at the time it was made.  In an email from Woolworth to Patti Sowal on September 26, 2000, he states that: "Mouse Zapper is VERY confidential because AgriZap will probably NOT be involved. . . .We might, long term, make our own Rat Zapper and do not want to put too much into it right now." (Kate M. Neiswender Decl., at Doc. No. W1609).  In another attached internal Woodstream document, it states that "[w]e are going through Agrizap in the short term to give Woodstream access to the technology."  (Id., at Doc.

18

No. W0868).  However, Woodstream does have proof that the Rat Zapper was sent to the overseas manufacturer for the purpose of cost evaluation.  In its exhibits accompanying this Motion, it includes the cost breakdown for the Rat Zapper and its components which was sent to Woodstream on August 8, 2000.  (Woodstream's Mot. Partial Summ. J., at Ex. O).  While the evidence supplied by Agrizap is dated after the cost evaluation, it could be implied from their context that during the summer of 2000, Woodstream's intent in sending the Rat Zapper overseas was for both cost evaluation and for the purpose of analyzing and infringing the Rat Zapper technology.  Nevertheless, this is a factual question for the trier of fact to decide.  As for the remaining prongs, whether Woodstream had the intent to mislead; whether Agrizap justifiably relied on the representation; and whether that reliance proximately caused Agrizap's injuries stemming from the alleged infringement are factual questions arising from these same disputed facts.  Therefore, summary judgment on Agrizap's fraudulent misrepresentation claim is denied.

## IV.    <u>CONCLUSION</u>

No genuine issues of material fact exist as to Agrizap's California Unfair Practices Act claim, California unfair competition law claim, trade disparagement claim, and breach of contract claim and Woodstream is entitled to judgment as a matter of law as to these claims.  Agrizap's fraudulent misrepresentation claim, however, presents genuine issues of material fact that must be resolved by the trier of fact.  Therefore, Woodstream's Motion for Partial Summary Judgment is denied as to the fraudulent misrepresentation claim and granted as to the other state law claims.

An appropriate Order follows.

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|                                      |     |                  |
|--------------------------------------|-----|------------------|
| AGRIZAP, INC.,                       | :   | CIVIL ACTION     |
|                                      | :   |                  |
| Plaintiff,                           | :   |                  |
|                                      | :   |                  |
| v.                                   | :   | No. 04-3925      |
|                                      | :   |                  |
| WOODSTREAM CORPORATION, et al.,      | :   |                  |
|                                      | :   |                  |
| Defendants.                          | :   |                  |

---

## O R D E R

**AND NOW** this 23rd  day of August, 2006, upon consideration of the Motion for

Partial Summary Judgment of Defendant Woodstream, and the Responses and Replies thereto, it

is hereby **ORDERED** that:

1.    Woodstream's Motion for Partial Summary Judgment (Doc. No. 74) is **DENIED**

      as to Agrizap's fraudulent misrepresentation claim; and

1.    Woodstream's Motion for Partial Summary Judgment (Doc. No. 74) is

      **GRANTED** as to all of Agrizap's other state law claims.


                                                      BY THE COURT:

_____


_____
                                             /s/ Robert F. Kelly
                                             ROBERT F. KELLY,            Sr. J.