**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                          :
AGRIZAP, INC.,                            :        CIVIL ACTION
                                          :
              Plaintiff,                  :
                                          :
       v.                                 :        No. 04-3925
                                          :
WOODSTREAM CORPORATION, et al.,           :
                                          :
              Defendants.                 :
_____:

<u>**MEMORANDUM**</u>

**ROBERT F. KELLY, Sr. J.**                        **OCTOBER 19, 2006**

         Plaintiff Agrizap, Inc. ("Agrizap") alleges that Defendant Woodstream Corporation

("Woodstream") infringed on its U.S. Patent No. 5,949,636 entitled "portable pest electrocution

device with resistive switch trigger" ("636 patent" or "Rat Zapper").  Presently pending before

this Court is Woodstream's Motion for Partial Summary Judgment of Patent Noninfringement.

For the following reasons, Woodstream's Motion is denied in part and granted in part.

**I.      <u>BACKGROUND</u>**

         The relationship between Agrizap and Woodstream began in 2000.  Woodstream

contacted Agrizap about the possibility of the two parties entering into a marketing and

distribution agreement for Agrizap's Rat Zapper Product.  The Rat Zapper is a rodent control

device that consists of a plastic canister with a metal plate at the bottom and an electrical charge

that ultimately kills the rodent.  An oral marketing and distribution agreement was established

between the two parties whereby Agrizap would manufacture and deliver Rat Zappers to

Woodstream and Woodstream would distribute them to various retailers.  The Rat Zappers,

however, would use Woodstream labels.

According to its Second Amended Complaint, Agrizap discovered in early 2004 that Woodstream was manufacturing and marketing its own electronic rat trap. Agrizap asserts that confusion in the retail market developed because of Woodstream's branding of the Agrizap Rat Zapper and because of Woodstream's newly introduced electronic rat traps. Agrizap asserts that if this continued, Woodstream would effectively undermine Agrizap's ability to sell its goods in the market. The Second Amended Complaint contains the following five counts against Woodstream: Violation of California's Unfair Business Practices Laws & Professions Code (Count I); Breach of an Oral Contract (Count II); Patent Infringement (Count III); Intentional Misrepresentation (Count IV); and Trade Disparagement (Count V).

This present Motion for Partial Summary Judgment is the third such motion filed by Woodstream. Woodstream's first partial summary judgment motion was on Agrizap's patent infringement claim and was based on the grounds of patent unenforceability and invalidity. This motion was denied. Its second motion was on Agrizap's state law claims. This Court granted summary judgment as to the California Unfair Business Practices Laws & Professions Code claims, the breach of contract claim, and the trade disparagement claim, but denied summary judgment as to the intentional misrepresentation claim. Thus, only the patent infringement claim and the intentional misrepresentation claim against Woodstream remain.

This present Motion addresses the claim of patent infringement directly. Agrizap alleges that patent claims 1, 2, 3, 5, 10, and 16 of the 636 patent are infringed by Woodstream's electronic mouse and rat traps. This Court previously determined the claim constructions for these patent claims. See Agrizap, Inc. v. Woodstream Corp., 431 F. Supp.2d 518, 525-532 (E.D.

Pa. 2006) (construing patent claims at issue).  Woodstream argues that the Woodstream traps do not infringe on these claims of the 636 patent either literally or under the doctrine of equivalents. Moreover, Woodstream argues that Agrizap is prohibited from claiming infringement under the doctrine of equivalents because of prosecution history estoppel.  In response, Agrizap argues that these claims have been infringed either literally or under the doctrine of equivalents and its expert, Dr. Barry N. Feinberg, provides the necessary facts to show that there are genuine issues of material fact.   With respect to prosecution history estoppel, Agrizap argues that it can rebut the presumption established by that doctrine so that it is not barred from claiming infringement under the doctrine of equivalents.  For the following reasons, Woodstream's Motion for Partial Summary Judgement is denied as to literal infringement and granted as to infringement under the doctrine of equivalents.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'"  <u>Hines v. Consol. Rail Corp.</u>, 926 F.2d 262, 267 (3d Cir. 1991)(citations omitted).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986).  The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact.  <u>Big Apple BMW, Inc. v. BMW of N. Am. Inc.</u>, 974 F.2d 1358, 1362 (3d Cir. 1992).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must

be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998), aff'd, 172 F.3d 40 (3d Cir. 1998)(citations omitted).  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates that there is a genuine issue of fact for trial.  See Big Apple BMW, at 1362-63.  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A district court should approach a summary judgment motion on the factual issue of infringement with great care.  Amhil Enterprises Ltd. v. Wawa, Inc., 81 F.3d 1554, 1557 (Fed. Cir. 1996). "Summary judgment may, however, properly be decided as a matter of law when no genuine issue of material fact exists and no expert testimony is required to explain the nature of the patented invention or the accused product or to assist in their comparison."  Id. at 1557-58.

## III.   DISCUSSION

### A.   Literal Infringement

Woodstream argues that its electronic rat and mouse traps do not literally infringe on Claims 1, 2, 3, 5, 10, and 16 of the 636 patent.  Woodstream offered the Declaration and expert report of Dr. Charles A. Eldering to show that there is no infringement because several of the claim limitations in the 636 patent are not found in the Woodstream traps.  In response, Agrizap submitted the Declaration and rebuttal expert report of Dr. Barry N. Feinberg, P.E.  Woodstream contends that none of the evidence presented by Agrizap is inconsistent with Dr. Eldering's

4

description of the Woodstream traps.  Thus, according to Woodstream, there are no genuine issues of material fact as to the structure, function, and operation of the Woodstream traps and summary judgment of patent noninfringement should be granted.  Conversely, Agrizap argues that there are genuine issues of material fact because Dr. Feinberg interprets the Woodstream traps differently than Dr. Eldering and finds that there is literal infringement of the 636 patent. For the following reasons, this Court has determined that there are genuine issues of material fact as to the literal infringement of the 636 patent.

Determining infringement is a two-step process where this Court must first construe the asserted claims and then compare the properly construed claims to the allegedly infringing devices.  Pause Tech. LLC v. TIVO Inc., 419 F.3d 1326, 1335 (Fed. Cir. 2005).  This Court completed the first step of this process, the claim construction, in a previous decision.  See Agrizap, 431 F. Supp.2d at 525-532. With respect to the second step, "[t]he patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents."  Pause Tech, 419 F.3d at 1335.

"Literal infringement is found where the accused device falls within the scope of the asserted claims as properly interpreted."  Lantech, Inc. v. Keip Mach. Co., 32 F.3d 542, 547 (Fed. Cir. 1994).  Each limitation of the asserted claim must be met by the accused device exactly.  Id. If even one claim limitation within the asserted claim is missing or not met, there is no literal infringement.  MicroStrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1352 (Fed. Cir. 2005).  Literal infringement is a question of fact.  Biagro Western Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1301 (Fed. Cir. 2005)  It is important to note that "[t]here are no broad rules, naturally enough, because of the intensely factual nature of the inquiry."  Robert L. Harmon,

Patents and the Federal Circuit, § 7.2(a)(ii) (7th ed. 2005).

  1. Claim 1(b)

  The first patent claim at issue is Claim 1(b).  Claim 1(b) states: "triggering the activation

of a high voltage and current generator in response to said sensed presence, said generator

coupled between said high voltage electrode and said reference electrode, said triggered

generator being activated for a predetermined time period."  The two terms in this claim that are

at issue are "triggering" and "predetermined time period."

  This Court construed "triggering" as: "the sensed presence of a pest results in an

immediate and irreversible triggering of the high voltage and current generator."  Agrizap, 431 F.

Supp.2d at 526.  Woodstream argues that the activation of the high voltage and current generator

in the Woodstream traps is not immediate and irreversible.  In his expert report and in his

Declaration, Dr. Eldering explains how the Woodstream traps are based on the use of a

microprocessor that runs software to accomplish all of its functions.  (Eldering Report ¶ 45;

Eldering Decl. ¶ 10).  He explains how the Woodstream traps go through a series of tests to

verify the presence of a pest before triggering the generator:

> The microprocessor wakes up from a sleep state due to an interrupt generated by
> the detection of a pest as sensed on PORT6 (pin 10) and enters the "WAKEUP"
> portion of the code.  The subsequent section of code, labeled "MOUSHV",
> contains a conditional skip operation, "JBS PORT6, MOUSEIN", which causes
> the subsequent line of code "JMP MYSEP" to be skipped if there is a pest present
> as detected on pin 10 as determined by a PORT6(MOUSEIN) = 1 test.  If a pest is
> not present, the "JMP MYSEP" code causes the microprocessor to return to the
> MYSEP portion of the code, resulting in re-entry into a sleep state.  It should be
> noted that there are two JBS PORT6, MOUSEIN tests in the code.  These tests
> prevent the sensed presence of the pest from causing an immediate and
> irreversible triggering of the high voltage and current generator due to the fact that
> the code will cause the microprocessor to return to a sleep state in the event that
> the pest is not detected three times on pin 10, the first detection causing the

microprocessor to wake up, and the second two detections allowing the microprocessor to continue on to activate the high voltage rather than returning to a sleep state.  It is my opinion that receipt of an interrupt to wake up the microprocessor and the subsequent tests to confirm the presence of a pest are not an immediate and irreversible triggering of the high voltage and current generator.

(Id.).  More succinctly, in his expert report, he states that "the process of having a microprocessor wake up due to the suspected presence of a pest and perform several (in this case two) tests to confirm the presence of a pest is not the same or analogous to the triggering described in" Claim 1(b).  (Eldering Report ¶ 45).  These tests to ensure the presence of a pest before activating the generator show, in his opinion, that the triggering of a Woodstream trap is not immediate.  In addition, Dr. Eldering believes that the triggering is not irreversible because if one of the test fails, the microprocessor goes back into sleep mode.

In response, Agrizap argues that Woodstream is mischaracterizing the sensing and verification process (the tests explained above) within the Woodstream traps.  According to Agrizap, the pest is not truly sensed in the Woodstream traps until the verification process is complete.  Dr. Feinberg, Agrizap's expert, states that "[o]nce the Woodstream traps sense that the rodent is really between the high voltage electrodes, it initiates the turning on of the high voltage generator to kill the rodent." (Feinberg Decl. ¶ 4).  He points out that Dr. Eldering's description even establishes that the sensed presence of a pest does not occur until after the verification tests have been successful.  Dr. Eldering's description states that "[i]f, due to the waking up and subsequent two tests for the presence of the pest it is determined that there is a pest present, the program continues on to activate the high voltage generator."  (Eldering Report ¶ 45).  Thus, according to Agrizap, sensing does not occur until after this verification process is completed and then the triggering to activate the generator occurs immediately and irreversibly

7

after this sensed presence is established.

This disagreement between the experts shows that there is a factual dispute over when the Woodstream traps officially establish a "sensed presence" of a pest; before, during, or after the verification process is complete.  Because "triggering" is not determined until the sensed presence of a pest has occurred, this factual dispute effects when "triggering" actually occurs in these traps and thus whether it is "immediate" and whether it is "irreversible."  The testimony of experts seems necessary to resolve this dispute.  See Amhil, 81 F.3d at 1557 (stating that summary judgment is only proper for infringement cases when there is no genuine issue of material fact and no expert testimony is required).  There are technical and factual aspects concerning the verification tests within the Woodstream traps that need to be examined and resolved by the trier of fact.

This Court construed "predetermined time period" as: "the time period between activation and deactivation of the generator that has its length programmed prior to the triggering of the generator."  Agrizap, 431 F. Supp.2d at 527.  Woodstream argues that the amount of time the high voltage generator is activated in the Woodstream traps depends upon conditions that cannot be predetermined.  According to Woodstream, the activation time period can only be determined after the fact "because it depends upon whether the trap detects a kill after one, two, or three activations, or whether no kill is detected after three attempts."  (Woodstream Partial Summ. J. Mem. 12).  Dr. Eldering states that "the Woodstream products can have up to three cycles of high voltage before the unit needs to be reset.  Claim 1 of the '636 patent calls for activation of the generator for a predetermined time period, whereas the Woodstream products perform three high voltage cycles."  (Eldering Report ¶ 46).  Dr. Eldering further explains:

> the Woodstream traps can perform up to three activations depending on if and
> when the pest leaves the unit.  Therefore, the time period between the initial
> activation and final deactivation (requiring a manual reset) is dependent on
> external timing parameters (e.g. presence of the pest) and is not a definitive time
> period.  As a result, the total time between activation and the deactivation
> requiring a manual reset cannot be predetermined.

(Eldering Decl. App. A).  Thus, Woodstream argues that the time period between activation and

deactivation fluctuates because the Woodstream trap may run only one cycle, two cycles, or three

cycles depending on external factors such as the presence of a pest in the trap.

In response, Dr. Feinberg declares that the triggered generator in a Woodstream trap is

activated for a predetermined time period.  He cites to Dr. Eldering's admission to such in the

claim chart attached to his Declaration.  Dr. Eldering states that "[t]he Woodstream traps utilize

functions in the microprocessor to establish a predetermined time period for an individual

activation cycle of the generator, the length of which is programmed prior to the triggering."

(Id.).  In addition, Dr. Eldering provides a state diagram and state tables of the Woodstream traps

in Appendix D.2 and D.3, respectively, of his expert report that indicate that the traps have a

predetermined time period.  The diagram in Appendix D.2 "shows that the high voltage in the rat

and mouse traps is turned on, activated, for a fixed period of time shown as ΔT.  Then . . .

[Appendix] D.3 . . . [shows] that the high voltage output is activated for 20 seconds for the

mouse trap and 120 seconds for the rat trap."  (Feinberg Decl. ¶ 6); see also (Feinberg Rebuttal

Report 3-4).  Therefore, Dr. Feinberg concludes that:

> it is clear that the Woodstream [traps] contain this element of claim 1.  It is
> irrelevant that the Woodstream devices can trigger the generator multiple times.
> This element of claim 1 does not address how many times the high voltage
> generator is activated, only that when the high voltage generator is *triggered* that
> it is activated for a predetermined time period.

(Feinberg Decl. ¶ 6).  According to Agrizap, the 20 second time period for the mouse trap and the 120 second time period for the rat trap are the predetermined time periods between activation and deactivation of the high voltage generator that are programmed prior to triggering.

Therefore, a genuine issue of material fact exists concerning whether the high voltage generator in the Woodstream traps is activated for a predetermined time period programmed prior to triggering or not.  Woodstream claims there is not a predetermined time period because the time period between initial activation and final deactivation depends on external factors such as the presence of the pest.  Thus, the length of time is variable depending on if the pest is killed after the first, second, or third cycle, or not killed at all because the pest left the trap.  Agrizap, on the other hand, claims that there is a time period between activation and deactivation programmed prior to triggering.  This is evidenced, according to Agrizap, by the 20 second and 120 second time periods mentioned in Eldering's expert report.  In addition, Agrizap believes that Woodstream is obscuring this fact by discussing its verification process and looking at the time period between <u>initial</u> activation and <u>final</u> activation instead of just between a single activation and deactivation of the generator.  It is important to note that the claim construction discusses "the time period between activation and deactivation" and is referring to the time between these two exact events.  Thus, the fact finder will have to determine when a single activation and its deactivation occurs within the Woodstream traps; how the verification tests interplay with activation and deactivation; and if the length of time between activation and deactivation is "programmed prior to the triggering of the generator."  The evidence offered by both parties indicate that there are factual disputes as to whether the Woodstream traps are activated for a "predetermined time period."

10

2.      Claim 1(d)

The second patent claim at issue is Claim 1(d).  Claim 1(d) states: "deactivating said

generator only upon expiration of said predetermined time period or in response to a reset

signal."  The terms in contention within this claim are "deactivating" and "reset signal."

This Court construed "deactivating" as:

the stopping of the activated generator either upon the expiration of the
predetermined time period or in response to a reset signal. The activated generator
can be deactivated only upon either of these two conditions (expiration of
predetermined time period or in response to a reset signal) and the generator must
be capable of being deactivated by both of these conditions.

Agrizap, 431 F. Supp.2d at 527.  "Reset signal" is construed as: "the power on reset signal."  Id.

at 528.  Woodstream argues that deactivation in the Woodstream traps is different than in the 636

patent because the generator does not deactivate in response to a power on reset signal.  Thus,

both conditions are not satisfied in the Woodstream traps.  Dr. Eldering states that:

[i]f the power is off in the Woodstream traps, the high voltage generator is off and
inherently deactivated.  In the Woodstream traps, the generator can be inherently
deactivated in response to a power down, but this power down does not result in a
reset (power on reset) signal.  The Woodstream traps have a reset pin which is
pulled to a logic high state upon power-up, with a power on reset signal only
occurring during powering up of the circuit from its off condition.  Any
"resetting" that occurs to the microprocessor as a result of a power up causes entry
into a main portion of the code.  Thereafter, the pin remains in a logic high state
and is certainly not used when the generator is running.  Therefore, the activated
generator cannot be deactivated in response to a reset signal.

(Eldering Decl. ¶ 11).  Woodstream is essentially arguing that the activated generator in the

Woodstream traps will deactivate when the power is turned off, but does not deactivate in

response to any power on reset signal because the power on reset signal occurs only upon the

powering up of the circuit.  Accordingly, Woodstream states that "[b]y its very definition, the

power on reset signal is generated on power up when the circuit is <u>already</u> in an off condition.  A circuit cannot be in an off condition and also be in an activated or running condition." (Woodstream's Reply Mem. 7).  Thus, a Woodstream trap cannot be deactivated by a power on reset signal because that signal only functions when the trap is already deactivated and turned off.

While Woodstream states that its traps do not deactivate in response to a reset signal, Agrizap argues that the Woodstream traps do perform this function.  Dr. Feinberg finds that:

> on "power up" the Woodstream devices . . . go to the "MAIN" trap setup subroutine, then branching to MYSEP subroutine to wait for the detection of the rodent.  This operation is identical to the "RESET" operation as noted in the state tables [in Dr. Eldering's expert report].  This indicates that the program operation "MAIN" is, in reality, the power on "RESET" operation.  Further, [in] appendix D.4 - *Commented Code for Mouse Killer* it is clearly seen that the subroutine "RESET" upon "power on" branches to the subroutine "MAIN" where it turns off the high voltage switch.

(Feinberg Decl. ¶ 7).  Woodstream does not really dispute Dr. Feinberg's description, but rather argues that he is only addressing what occurs upon powering up the trap after it was already turned off and deactivated.  According to Woodstream, there is no indication from Dr. Feinberg's description that the MAIN subroutine, which Dr. Feinberg suggests is the power on reset signal, "would ever take place during the high voltage generation so as to deactivate the generator," (Woodstream's Reply Mem. 7), but rather, it would only take place after deactivation has already occurred.

The factual dispute at issue here is whether deactivation of the Woodstream traps can occur in response to a power on reset signal.  Woodstream is interpreting the power on reset signal to be the powering up of the trap and thus does not involve powering down, or deactivating the trap.  Agrizap seems to view the power on reset signal as an "on and off" button.

The finder of fact will have to determine what truly is the function of the power on reset signal and whether the Woodstream traps also literally perform this function.  Expert testimony will likely be required to understand the technical workings of the power on reset signal.  See Amhil, 81 F.3d at 1557 (stating that summary judgment is only proper for infringement cases when there is no genuine issue of material fact and no expert testimony is required).  Based on the evidence provided by both parties, this factual issue is in dispute.

        3.     Claim 1(e)

The third patent claim at issue is Claim 1(e).  Claim 1(e) states: "inhibiting said triggering step once activation of said generator is triggered, until said reset signal is detected."  The "inhibiting" term within this claim is at issue.  This Court construed "inhibiting" as: "the triggering step is inhibited upon each and every activation of the triggering of the generator until the power on reset signal is detected; each time the high voltage generator is activated, further triggering cannot take place, at least until the power on reset signal is detected."  Agrizap, 431 F. Supp.2d at 529.

Woodstream contends that its traps do not inhibit triggering upon each and every activation of the generator until the power on reset signal is detected.  Instead, the traps allow up to three automatic activations of the generator without any need of a power on reset signal to de-inhibit the traps' triggering step.  Dr. Eldering explains that triggering is not inhibited after each and every activation of the generator because "after each of the first two activations, the trap is re-armed without requiring a power on reset signal.  The Woodstream traps enable up to three automatic activations of the generator.  After the third activation of the generator, the system enters sleep mode."  (Eldering Decl. ¶ 12).  Thus, according to Woodstream, there is not an

inhibition of the triggering after each and every activation of the generator because its traps consecutively go through three activations without requiring a reset after each activation.

In response, Agrizap argues that Woodstream is improperly relying on how its system works when it fails to kill the pest. Agrizap does not dispute that the Woodstream traps apply three high voltage cycles. Agrizap, however, argues that Woodstream admits that "[i]f, after any of the three high voltage cycles, it is determined that a pest has been killed, then the unit will be disarmed and must be reset." (Woodstream's Statement of Material Facts Not in Genuine Dispute ¶ 7). Dr. Feinberg explains how the triggering is inhibited after each cycle of activation until the reset signal is detected. He states that when the Woodstream traps are turned on, the computer program goes though an initial step, MAIN, and then goes to a subroutine MYSEP to wait for detection of the pest. (Feinberg Decl. ¶ 7). Dr. Feinberg states that the MYSEP subroutine represents the "power on reset signal" in the Woodstream traps and that "[t]he triggering of the high voltage is inhibited until the execution of the MYSEP subroutine has been accomplished." (Id.). He acknowledges that the Woodstream traps are capable of three activations of the high voltage, but explains that:

> [a]fter each of the first two activations, the Woodstream traps are reset by branching in their computer program to the subroutine MYSEP which in turn generates the identical sequence of steps used as the power on reset signal in the Woodstream rat and mouse traps. Thus the "reset signal" produced by the MYSEP subroutine is the signal that is generated upon the powering up of the circuit from its off condition as construed by the Court.

(Id.). Accordingly, Agrizap states that the Woodstream traps are inhibited after each activation of the generator and require reset by way of the MYSEP subroutine before the traps can be re-triggered.

14

Therefore, a genuine factual dispute exists between the parties.  As shown above, Woodstream claims that because its traps go through up to three activations before entering a sleep mode, triggering is not inhibited after each and every activation.  Agrizap, on the other hand, argues that after each of the activations, the Woodstream traps are inhibited and require a reset signal through the process of the MYSEP subroutine before re-triggering can occur.  Thus, whether the Woodstream traps infringe Claim 1(e) is a genuine issue of material fact.

    4.    <u>Claims 2, 3, 5, and 10</u>

Patent claims 2, 3, 5, and 10 of the 636 patent are dependent claims.  These claims are dependent on independent Claim 1.  Patent claims can be written in independent, dependent, or multiple dependent form.  Herbert F. Schwartz, <u>Patent Law and Practice</u>, § 2.III.B.1 (3d ed. 2001); 35 U.S.C. § 112, ¶ 3.  An independent claim is completely self-contained.  Schwartz, <u>supra</u>, at § 2.III.B.1.  On the other hand, a dependent claim contains a reference to a previous claim and then specifies a further limitation of the subject matter claimed.  <u>Id.</u>; 35 U.S.C. § 112, ¶ 3.  A dependent claim is "construed to incorporate by reference all the limitations of the claim to which it refers."  <u>Id.</u>  It is a fundamental principle of patent law that "dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed."  <u>Jeneric/ Pentron, Inc. v. Dillon Company, Inc.</u>, 205 F.3d 1377, 1383 (Fed. Cir. 2000).

Woodstream argues that only the independent claims, Claim 1 and Claim 16, require consideration by this Court because if these claims are not infringed then dependent Claims 2, 3, 5, and 10 are not infringed.  Agrizap argues that Woodstream does not meet its summary judgment burden of establishing the absence of any triable issues of material fact because it is silent on Agrizap's claims that the Woodstream traps infringe dependent Claims 2, 3, 5, and 10.

15

Furthermore, Agrizap argues that Dr. Eldering does not dispute Dr. Feinberg's conclusions of infringement with respect to these claims.

Because the claim limitations within Claim 1 are incorporated by reference in Claims 2, 3, 5, and 10, then the factual disputes over the Claim 1 claim limitations are also factual disputes for these dependent claims. In addition, factual issues as to the specific limitations within Claims 2, 3, 5, and 10 were not addressed by the moving party, Woodstream. Therefore, summary judgment is inappropriate on these claims.

5.    Claim 16

The last patent claim at issue is Claim 16. This Court has previously construed subparagraphs (b)(i), (b)(iii), and (b)(iv) of Claim 16. Agrizap, 431 F. Supp.2d at 531-32. Woodstream argues that there is no literal infringement of Claim 16 because Agrizap is trying to correlate the specific electronic structural components laid out in Claim 16 to the computer code instructions performed by the Woodstream microprocessor. In sum, Woodstream contends that computer code is not the circuitry of the specific electronic structural components recited in Claim 16, so there can be no literal infringement. Agrizap argues that Dr. Feinberg establishes that the Woodstream traps literally infringe Claim 16. Given that there is disagreement between the experts, a genuine factual dispute exists and summary judgment is inappropriate.

a.    Claim 16(b)(i)

Subparagraph (b)(i) of Claim 16 reads:

b) an electronic portion comprising:
i) a resistive switch coupled between said high voltage electrode and said reference electrode, said resistive switch further comprising a trigger circuit having a trigger output and an arm/ disarm input.

This Court construed Claim 16(b)(i) as "a switch that is physically connected across the electrodes.  The switch includes a distinct trigger circuit with a trigger output and an arm/ disarm input."  Agrizap, 431 F. Supp.2d at 531.

Woodstream argues that its traps do not have a resistive switch which includes a trigger circuit and an arm/ disarm input, but rather have a microprocessor that accomplishes the activation of the high voltage generator.  (Eldering Decl. ¶ 13; Eldering Report ¶ 55).  Dr. Eldering states that:

> [t]he Woodstream products do not have a trigger circuit, but rather use the microprocessor to accomplish the activation of the high voltage circuit. Furthermore, the trigger circuit of claim 16 includes a trigger output and an arm/ disarm input.  The microprocessor of the Woodstream products does not have a structure that resembles the trigger circuit of claim 16, nor does it have an arm/ disarm input.  While awaiting a pest, the microprocessor . . . enters into sleep mode, awakens upon the detection of the presence of a pest, . . .checks for the presence of a pest several times before activating the high voltage generator.  The microprocessor cannot, in my opinion, be considered to be a trigger circuit as described in claim 16.

(Id.).  Dr. Eldering states that the microprocessor is the operative mechanism within the Woodstream traps and cannot be viewed as the structural component of a resistive switch containing a triggering circuit with a trigger output and an arm/ disarm input.

Agrizap addresses each portion of the claim construction of Claim 16(b)(i) and shows how each is literally present in the Woodstream traps.  First, Dr. Feinberg show that the Woodstream traps have "a switch that is physically connected across the electrodes."  He references Dr. Eldering's Declaration which states that "[t]he Woodstream traps utilize a microprocessor (EM78P153) to detect the presence of a pest as sensed by a voltage divider circuit connected to pin 10 (utilized in the microprocessor as "PORT6") of the microprocessor."

(Feinberg Decl. ¶ 9 (citing Eldering Decl. ¶ 10))[1]. This "voltage divider circuit" is the switch physically connected across the electrodes in the Woodstream traps. For further support, Dr. Feinberg also states that "the electronic schematics of the Woodstream traps [show] the voltage divider network . . . as part of the high voltage electrode system of the Woodstream traps." (Feinberg Decl. ¶ 9). Second, Dr. Feinberg contends that the Woodstream traps have a "distinct trigger circuit with a trigger output." He states that:

> [t]he Woodstream traps utilize[] assembly language code that causes the microprocessor to respond (wake up) if there is an appropriate change in resistance across the electrodes indicat[ing] the presence of a rodent. This change in resistance causes a voltage to be applied to pin 10 of the microprocessor. This sets into motion the "triggering" of the high voltage as this term has been construed by the Court. Thus, the Woodstream traps have a "trigger circuit" which have trigger outputs, i.e. an output that sets into motion the release of the high voltage used to kill the rodent in the trap. This circuit that senses the change in resistance resulting in a voltage input to pin 10 of the microprocessor is a distinct trigger circuit whose output is used to trigger the high voltage output of the Woodstream traps.

(Id.). Third, Dr. Feinberg explains that the Woodstream traps have an "arm/ disarm input" in its trigger circuit. He states that the Woodstream trap:

> is armed when it received a reset signal. The Woodstream rat and mouse traps perform the same function in the assembler computer code in the microprocessor that makes up part of the electronics in these devices. When a rodent is detected the Woodstream traps disable the interrupts to the microprocessor with the instruction (DISI). Then, in the sequence of computer instructions it branches to the subroutine KMOUSE to kill the rodent with high voltage electrical current. . . . [T]he subroutine KMOUSE, contains a set of three assembler code computer instructions that first turns on the high voltage switch (BS PORT6, PLUSE), then institutes a delay in terminating the high voltage (CALL DELY76) in order to deliver the high voltage to the rodent for the specified time. Finally, the high voltage switch is turned off, with the instruction (BC PORT6, PLUSE). When

---

[1]        Dr. Feinberg added an additional sentence, "The switch includes a distinct trigger circuit with a trigger output and an arm/ disarm input," to his quote of Dr. Eldering that is not actually present in Dr. Eldering's Declaration. This Court disregarded this sentence in its consideration of the present summary judgment motion.

these assembler code instructions are executed in the microprocessor used in the
Woodstream traps, the triggering step of the high voltage is inhibited.  Therefore,
the Woodstream rat and mouse trap[] stops, deactivates, the activated high voltage
generator upon the expiration of the predetermined time period.  Once the high
voltage is terminated, the microprocessor instruction set goes back to arming the
system again.

(Id.).  Thus, Dr. Feinberg explains how the subroutines of the microprocessor turn on and arm the

triggering circuit, then disarm it, and then when the voltage is terminated, arm the system again.

Dr. Feinberg's analysis creates genuine factual disputes as to whether the Woodstream

traps have "a switch that is physically connected across the electrodes" and whether they have a

"trigger circuit having a trigger output and an arm/ disarm input."  While Dr. Feinberg does

discuss how these functions are present in the Woodstream traps within the microprocessor, he

makes a reasonable argument that the microprocessor and its underlying computer code literally

perform the functions in question.  At summary judgment, it is not the job of this Court to weigh

the evidence presented, but rather just to determine if there any genuine issues of material fact.

See Ritchie v. Henderson, 161 F. Supp.2d 437, 446 (E.D. Pa. 2001) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986)).  All that is necessary to show that a dispute over a

material fact is "genuine," is for the evidence to be such 'that a reasonable jury could return a

verdict in favor of the non-moving party.'"  Compton, 995 F. Supp. At 561 n.14.  The evidence

Agrizap presents meets this standard.  It will be up to the fact finder to determine if the computer

code processes described by Dr. Feinberg literally infringe the elements described in Claim

16(b)(i).

b.      Claim 16(b)(iii)

Subparagraph (b)(iii) of Claim 16 states:

b) an electronic portion comprising:
iii) a timing module having an input coupled to said trigger output of said resistive switch, a control output coupled to said generator control input and an arm/ disarm output coupled to said arm/ disarm input of said resistive switch.

This Court construed this subparagraph as: "a specific distinct timing module having an input and two outputs.  The input is connected to the trigger output of the resistive switch.  A control output is connected to the high voltage generator control input.  An arm/ disarm output is connected to the arm/ disarm input of the resistive switch."  Agrizap, 431 F. Supp.2d at 531.

Woodstream argues that its traps do not have a timing module, but rather "use the microprocessor to initiate generation of the high voltage."  (Eldering Report ¶ 56).  Dr. Eldering states that:

> the Woodstream traps use several portions of computer code to generate pulses, those pulses being used as the basis for the generation of high voltage and current. Control of the timing of the pulses originates from the various sections of the computer code, which cannot, in my opinion, be considered to be a specific distinct timing module.

(Eldering Decl. ¶ 15).  On the other hand, Agrizap argues that there is a distinct timing module in the Woodstream traps.  Dr. Feinberg states that "[w]hen there is a sensed input to the microprocessor, the program branches to a timing subroutine."  (Feinberg Rebuttal Report, 13).  More specifically, "[w]hen a rodent is present in the resistive switch, the resistive switch produces a voltage output that is applied to pin 10 of the microprocessor.  Through a sequence of programming steps, the computer program branches to a timing subroutine module, DELY760."  (Feinberg Decl. ¶ 12).  This timing subroutine module, DELY760, is a specific distinct timing module "whose input is 'connected' via programming steps to the resistive switch."  (Id.).  Dr. Feinberg also explains how the requisite input and outputs of Claim 16 (b)(iii) are present.  (Id.,

at ¶ 13, 14).

Similar to subparagraph (b)(i), Dr. Feinberg's analysis creates a factual dispute over subparagraph (b)(iii).  Both parties raise opposing viewpoints and facts as to whether the Woodstream traps have a timing module with an input and two outputs connected to the resistive switch.  The strength of either sides factual arguments, as stated above, is not for this Court to decide at summary judgment.

        c.     Claim 16(b)(iv)

Lastly, the last clause of Claim 16(b)(iv) is at issue.  It reads: "said timing module disarms said trigger circuit of said resistive switch upon said activation of said timer module until said timer module is reset."  This Court construed this clause as: "the timing module has an output that is coupled to the trigger circuit of the resistive switch to disarm the trigger circuit until a power on reset signal re-enables or re-sets the timing module."  Agrizap, 431 F. Supp.2d at 531-32.

Dr. Eldering contends, as he explained with regards to Claim 16 (b)(i) and (b)(iii), that the microprocessor in its traps do not have a timing module and an arming and disarming of a resistive switch.  (Eldering Report ¶ 57; Eldering Decl. ¶ 16).  Dr. Feinberg states that the Woodstream traps "perform the same function [as described by this portion of Claim 16(b)(iv)] by executing assembler computer code subroutines in the microprocessor that makes up part of the electronics in these devices."  (Feinberg Decl., ¶ 16).  Dr. Feinberg then goes through a lengthy discussion of how a sequence of computer code instructions in the microprocessor literally perform the function of disarming the trigger circuit until a power on reset signal resets the timing module.  (Id.).

21

Once again, the issue is whether the processes of the microprocessor in the Woodstream traps literally infringe the claim in question.  The Woodstream traps literally infringe the 636 patent if they fall within the scope of the asserted claims as properly interpreted and each claim limitation is met exactly.  Lantech, 32 F.3d at 547.  Any deviation precludes a finding of infringement.  Id.  Agrizap, through Dr. Feinberg, makes reasonable arguments based on evidence from his understanding of the workings of the Woodstream traps.  Whether the fact that these processes are accomplished by a microprocessor falls within the scope of Claim 16 is a question for the finder of fact to decide.

**B.     Doctrine of Equivalents**

If there is no literal infringement, Agrizap argues that it can still show that the Woodstream traps infringe the 636 patent under the doctrine of equivalents.  Woodstream argues that Agrizap cannot utilize the doctrine of equivalents because it is prohibited from doing so pursuant to the prosecution history estoppel doctrine.  This Court finds that prosecution history estoppel applies and Agrizap is prohibited from asserting infringement under the doctrine of equivalents.

"The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described."  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 732 (2002).  Thus, an accused device that does not literally infringe a patent claim may still infringe that claim under the doctrine of equivalents if every element in the claim is either literally or equivalently present in the accused device.  Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997).  A claim element is equivalently present "if only 'insubstantial differences' distinguish the missing claim element from the corresponding

aspects of the accused device." Id.  Stated another way, the doctrine of equivalents applies if the accused device "performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608 (1950).  Equivalence is a question of fact and summary judgment should be granted where no reasonable fact finder could find equivalence. Sage Products, 126 F.3d at 1423.

The doctrine of prosecution history estoppel may bar a patentee from asserting the doctrine of equivalents. Honeywell Int'l Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1139 (Fed. Cir. 2004).  To determine prosecution history estoppel, the Court must examine any relevant amendments to the patent made by the patentee during its prosecution before the Patent and Trademark Office ("PTO").  Prosecution history estoppel may occur when a narrowing amendment to a patent claim is made to satisfy any requirement of the Patent Act. Business Objects, S.A. v. Microstrategy, Inc., 393 F.3d 1366, 1374 (Fed. Cir. 2005).  This narrowing amendment gives rise to a presumption that the patentee surrendered any subject matter between the original claim and the amended claim. Id.  Thus, the patentee surrenders any equivalent within the scope of the original claim and the amended claim.  "[A] narrowing amendment may occur when either (1) a preexisting claim limitation is narrowed by amendment or (2) a new claim limitation is added by amendment." Honeywell, 370 F.3d at 1140.  The patentee, however, may overcome this presumption by showing "that the alleged equivalent could not reasonably have been described at the time the amendment was made, or that the alleged equivalent was tangential to the purpose of the amendment, or that the equivalent was not foreseeable (and thus not claimable) at the time of the amendment." Business Objects, 393 F.3d at 1374.  The patentee bears the burden of proving that an amendment was not made for a reason that would give rise to

estoppel and if estoppel does apply, the patentee also bears the burden of showing that the amendment does not surrender the particular equivalent in question.  Festo, 535 U.S. at 740. Prosecution history estoppel and all issues relating to its application and scope are questions of law.  BiagroWestern Sales, 423 F.3d at 1301-02.

Therefore, this Court must decide as a matter of law if prosecution history estoppel prohibits Agrizap from claiming infringement under the doctrine of equivalents.  Agrizap states that during the prosecution of the 636 patent, Claims 1 and 16 were amended such that "the presumption would likely arise that Agrizap surrendered the subject matter between the original claim and the amended claim."  (Agrizap's Resp. to Court's Letter, 1).  Thus, Agrizap does not challenge that its amendments to the 636 patent give rise to estoppel; however, Agrizap does argue that it can overcome the presumption it establishes.

As stated above, there are three possible circumstances in which the patentee can overcome the presumption.  Agrizap relies on the "tangential relationship" circumstance that asserts that "the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question."  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359, 1369 (Fed. Cir. 2003).  The primary consideration in determining this circumstance is "whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent."  Id.  This Court shall only examine the prosecution history record without introduction of additional evidence, except, if testimony from those skilled in the art as to the record's interpretation is necessary.  Id. at 1370.  The United States Court of Appeals for the Federal Circuit has stated that while specific instances of "mere tangentialness" cannot be anticipated, "an amendment made to avoid prior art that contains the equivalent in question is not

24

tangential." Id. at 1369.  However, it does not follow that equivalents not within the prior art

must be tangential to the amendment.  Chimie v. PPG Indus., 402 F.3d 1371, 1383 (Fed. Cir.

2005).

Agrizap argues that the amendments to Claim 1 and 16 were made to overcome prior art

references that utilized simple electronic components rather than the microprocessor/ software

based system which is the equivalent in question.  The prior art references that Agrizap was

trying to avoid through its amendments were the Ford, Madsen, Dye, and Stirewalt patents.

None of these patents and none of the PTO's communications were concerning the

microprocessor system in question.  Thus, Agrizap is arguing that the purpose of the amendments

was to avoid these prior art references and these references bear no relevance, and are thus

tangential, to the alleged microprocessor-based equivalent.

Woodstream argues that Agrizap's rebuttal argument is both an oversimplification of the

issue and legally insufficient.  According to Woodstream, the issue is not whether the

Woodstream microprocessor is different from the prior art references, but whether the elements

of the Woodstream traps asserted to be equivalents are tangential or peripheral to the purposes

for the narrowing amendments.  Woodstream contends that the purposes for the amendments are

directly related to the equivalents in the Woodstream traps.  This Court agrees with Woodstream.

1.     Claim 1(b)

After receiving a second prior art rejection by the PTO, Agrizap amended Claim 1(b) as

follows (underlining shows the language added and bracketing shows the language deleted):

"triggering the activation of [activating] a high voltage and current generator in response to said

sensed presence, said generator coupled between said high voltage electrode and said reference

[ground] electrode, <u>said triggered generator being activated</u> for a predetermined time <u>period</u> [in response to said sensed presence]."  During the patent prosecution, Agrizap argued that the claim limitation concerning the triggering of the activation of the generator in response to a sensed presence was added because the prior art references, the Dye and Ford patents, do not perform this function.  In its Remarks section of the Amendment, Agrizap states that "Dye does not sense the presence of a pest between a high voltage electrode and a reference electrode, but rather between a separate low voltage sensed electrode and a reference electrode" and that "Dye does not trigger the activation of its generator in response to the sensed presence, but rather activates the generator in response to the sensed presence."  (Woodstream Mot. Partial Summ. J. Ex. H, at 000119).  With respect to the Ford patent, Agrizap argued, "Ford does not trigger activation of the generator for a predetermined time in response to a sensed presence, but rather simply activates the generator whenever the mechanical switch is closed."  (<u>Id.</u>, at 000124).  Thus, the purpose of the amendment concerning triggering the activation of the generator in response to a sensed presence was to distinguish the 636 patent from these prior art references that just simply activate the generator.  The equivalent Agrizap is trying to claim here is that the Woodstream traps accomplish this triggering of the activation through its microprocessor-based system.  Therefore, the purpose of the amendment and the equivalent both concern the triggering of the activation of the generator.

The other amendment made to Claim 1(b) is that the triggered generator is activated for a predetermined time period.  Agrizap made this amendment to distinguish the 636 patent from the Dye, Stirewalt, and Ford patents that do not maintain activation of the generator for a predetermined time period.  Agrizap argued that "Dye does not maintain the activation of its

generator for a predetermined time period, but rather maintains activation for as long as the presence is sensed." (Id., at 000119). Agrizap argued that Stirewalt does not run for a predetermined time period "because the system . . . does not time anything unless a resistive body is in contact with the electrodes such that current is flowing through the circuit. Thus, there is no way to know how long the generator of Stirewalt will remain active." (Id., at 000120). Agrizap further explains how the time period in Stirewalt is "impossible to predict" and the fact that the generator could remain energized is a real hazard. (Id., at 000120-121). Agrizap contends that the 636 patent eliminates this hazardous condition. (Id.) With respect to Ford, Agrizap argued that "the time which the generator remains active cannot be predetermined because the generator will deactivate as soon as the body falls away from the switch." (Id., at 000124). Thus, the purpose of the amendment was to show that the 636 patent's generator is activated for a predetermined time period opposed to being activated for an undefinable time period as in the prior art references. Agrizap is claiming that the equivalent in question does perform this function of activating the generator for a predetermined time period via programmed values in the microprocessor assembly code instructions. Woodstream, on the other hand, claims that its traps do not activate for a predetermined time period. Therefore, both the purpose of the amendment and the equivalent in question relate to whether activation occurs for a predetermined time period. Accordingly, because the equivalents are directly related to purposes for the amendments made to Claim 1(b), they cannot be considered tangential.

        2.    <u>Claim 1(d)</u>

Agrizap amended Claim 1 by adding subsection (d). Claim 1(d) states, "<u>deactivating said generator only upon expiration of said predetermined time period or in response to a reset</u>

27

signal." Agrizap argued that "Dye does not deactivate its generator only upon expiration of the predetermined time or in response to a reset signal, but rather only in response to a lack of a sensed pest." (Id., at 000119). Agrizap also argued that "Ford does not deactivate the generator only upon expiration of a predetermined time or in response to a reset signal." (Id., at 000124). Agrizap, therefore, added this amendment for the purpose of distinguishing the deactivating function in the 636 patent from the deactivation function in the prior art references. With respect to the equivalence in question, Agrizap is arguing that the Woodstream traps do deactivate upon a predetermined time period or through a reset signal within the microprocessor, while Woodstream argues otherwise  Therefore, the purpose of the amendment and the equivalent in question both concern the deactivating of the generator and cannot be considered tangential.

        3.     Claim 1(e)

     Agrizap amended Claim 1 by adding subsection (e). Claim 1(e) states, "inhibiting said triggering step once activation of said generator is triggered, until said reset signal is detected." Agrizap's purpose for this amendment was to distinguish the 636 patent from the prior art references that do not inhibit the generator from retriggering once it is activated. Agrizap argues that "Dye does not inhibit a retriggering of the activation of the generator, once activation has been triggered, until detection of a reset signal, but rather permits activation any time a presence is sensed." (Id., at 000119). When discussing the combination of the Dye, Madsen, and Ford patents, or the combination of the Dye, Madsen, and Stirewalt patents, Agrizap argues that each combination has the same shortcoming of not deactivating the generator and not preventing it from reactivating. (Id., at 000125). According to Agrizap, this shortcoming creates a hazardous condition and possible injury for an unsuspecting human or pet. (Id.). The 636 patent corrected

this shortcoming.  With respect to the equivalent in question, Agrizap argues that the Woodstream traps do the same inhibiting function as described in Claim 1(d) but through the processes of the microprocessor.  Therefore, both the purpose of this amendment and the equivalent are directly related and cannot be considered tangential.

        4.    <u>Claim 16</u>

Claim 16 was originally prosecuted before the PTO as Claim 13, but was subsequently re-numbered upon amendment.  The substance of Claim 16 was amended twice during the 636 patent prosecution.  The claim limitations within Claims 16(b)(i), (b)(iii), and (b)(iv), which are at issue in this infringement case, were all added or amended during the patent prosecution.

Subsection (b)(i) was amended as follows: "a resistive switch coupled between said high voltage electrode and said reference electrode, <u>said resistive switch further comprising a trigger circuit having a trigger output and an arm/ disarm input.</u>"  Agrizap argued that "Dye does not teach a switch means having a trigger output which becomes active if not disarmed; the resistive switch taught by Dye is always armed."  (<u>Id.</u>, at 000120).  Thus, this amendment was made for the purpose of showing that the resistive switch in the 636 patent can be disarmed while it cannot in the Dye patent.  Agrizap is trying to claim an equivalent in the Woodstream traps that has this arm/ disarm function utilizing assembler code instructions programmed into the microprocessor. Therefore, both the purpose for the amendment and the equivalent are directly related to the same issue.

Subsection (b)(iii) was amended as follows: "a [trigger circuit] <u>timing module</u> having an input coupled to <u>said trigger output</u> of said resistive switch<u>, a control</u> [and an]output coupled to said generator control input <u>an arm/ disarm output coupled to said arm/ disarm input of said</u>

resistive switch," The amendments here concern a timing module and the resistive switch explained above. With respect to the timing module, Agrizap argued that "Dye does not teach a timing means or timing module of any kind." (Id.). Agrizap also argued how "Stirewalt does not teach a timing means/ timing module which disarms the resistive switch from reactivating the generator after the initiation of the predetermined time period." (Id., at 000121). Furthermore, Agrizap states that "[t]here is no recognition in either Stirewalt or Dye, or any teaching, which instructs or even suggests to someone of ordinary skill how to implement a timer in the pest electrocution art to" prevent injury or conserve battery power. (Id., at 000122). The purpose of this amendment was to distinguish the prior art references that had no timing module with the 636 patent which does have a timing module. With respect to the equivalent in question, Agrizap claims that the Woodstream traps have a timing module performed through a sequence of computer programming steps. Therefore, the purpose for the amendment and the equivalent in question both directly relate to the issue of a timing module and thus cannot be considered tangential.

Lastly, the last clause of Claim 16(b)(iv) is at issue. This clause was added in its entirety after the second prior art rejection by the PTO. This clause reads, "wherein said timing module disarms said trigger circuit of said resistive switch upon said activation of said timer module until said timing module is reset." This amendment concerns the timing module and the resistive switch functions that were discussed above. Thus, the purpose of this amendment, while not explicitly stated in the prosecution history record, seems to be similar if not the same as the previously discussed amendments. Also, Agrizap is once again claiming an equivalent that essentially does these same timing module and resistive switch functions but through the

microprocessor, while Woodstream argues otherwise.   Therefore, the purpose for the amendment and the equivalent in question are directly related and not tangential.

In conclusion, Agrizap cannot rebut the presumption established by prosecution history estoppel because the purpose of Agrizap's narrowing amendments bear more than a tangential relationship to the equivalents in question.   Agrizap tried to make its tangential relationship argument based on its broad discussion that the amendments were made for the purpose of distinguishing the 636 patent from the prior art references and the prior art references did not have any relation to a microprocessor based system, which is the equivalent in question.   This broad approach to comparing the purpose of the amendments to the equivalents in question is inappropriate.   The fact that the equivalents are not within the prior art does not automatically lead to the conclusion that they are tangential to the purpose of the amendment.   See Chimie, 402 F.3d at 1383; Honeywell Int'l, Inc. v. Hamilton Sunstrand Corp., No. 99-309, 2006 WL 2346446, *6 (D. Del. Aug. 14, 2006); Windbrella Products Corp. v. Taylor Made Golf Co., Inc., 414 F. Supp.2d 305, 318 (S.D.N.Y. 2006).   This Court had to examine the precise purpose for each amendment and not just the generalized purpose that they were made to avoid prior art references.   Likewise, the equivalents within the Woodstream trap needed to be examined in connection with each relevant amendment, rather than just examining the character of the Woodstream trap as a whole; i.e. the fact that it uses a microprocessor to carry out its functions. As explained above, each amendment was added for the purpose of showing that the 636 patent contained a function not present in the prior art and each equivalent in question was being claimed to essentially do that function in question, just through the use of a microprocessor.   The purpose of the amendments and their related equivalents were far from tangentially related,

rather, they were directly related.  Therefore, Agrizap cannot rebut the presumption of prosecution history estoppel and is prohibited, as a matter of law, from claiming infringement under the doctrine of equivalents.  Summary judgment on the doctrine of equivalents is thus granted in Woodstream's favor.

## IV.    CONCLUSION

The evidence provided by both parties' experts demonstrate that there are genuine issues of material fact as to the literal infringement of the 636 patent by Woodstream.  Agrizap could not rebut the presumption of prosecution history estoppel and is barred from claiming infringement under the doctrine of equivalents.  Therefore, Woodstream's Motion for Partial Summary Judgment of Patent Noninfringement is denied as to literal infringement and granted as to the doctrine of equivalents

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
AGRIZAP, INC.,                          :        CIVIL ACTION
                                        :
            Plaintiff,                  :
                                        :
    v.                                  :        No. 04-3925
                                        :
WOODSTREAM CORPORATION, et al.,         :
                                        :
            Defendants.                 :
_____ :

**O R D E R**

    **AND NOW** this   19th   day of October, 2006, upon consideration of the Defendant

Woodstream's Motion for Partial Summary Judgment on Patent Noninfringement, and the

Responses and Replies thereto, it is hereby **ORDERED** that:

    1.    Woodstream's Motion for Partial Summary Judgment (Doc. No. 91) is

        **DENIED** as to Agrizap's literal infringement claim; and

    2.    Woodstream's Motion for Partial Summary Judgment (Doc. No. 91) is

        **GRANTED** as to Agrizap's infringement claim under the doctrine of

        equivalents.

BY THE COURT:

 /s/ Robert F. Kelly
ROBERT F. KELLY,       Sr. J.