IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AGRIZAP, INC., | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 04-3925 |
| WOODSTREAM CORPORATION, et al., | |
| Defendants. | |

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                                                 **MAY 15, 2007**

      Presently before this Court is Defendant Woodstream Corporation's ("Woodstream") Renewed Motion for Judgment as a Matter of Law and in the Alternative, for Remittitur and for a New Trial. For the following reasons, this Motion is granted in part and denied in part.

**I.      BACKGROUND**

      Plaintiff Agrizap, Inc. ("Agrizap") brought suit against Woodstream for patent infringement of its U.S. Patent No. 5,949,636 entitled "portable pest electrocution device with resistive switch trigger" ("636 patent" or "Rat Zapper"). Agrizap also alleged related state law claims. The only state law claim to survive summary judgment was its fraudulent misrepresentation claim regarding Woodstream sending the Rat Zapper overseas for cost evaluation.

      A jury trial on this matter commenced on February 20, 2007 and concluded on March 7, 2007. The jury returned a verdict in Agrizap's favor on both the patent infringement claim and the fraudulent misrepresentation claim. Specifically, with respect to the infringement claim, the

jury found that Woodstream did not infringe Claims 1, 2, 3, 5, or 10 of the 636 patent, but did infringe Claim 16 of the 636 patent. The jury found that Woodstream's infringement was not willful. Moreover, the jury found that Woodstream did not prove, by clear and convincing evidence, any of its affirmative defenses to infringement.

With respect to damages, the jury awarded $1,425,000 for the infringement of claim 16. This amount consists of $900,000 for Agrizap's lost profits and $525,000 for its reasonable royalty claim. The jury awarded $1,275,000 in damages for the fraudulent misrepresentation claim. Thus, the jury awarded Agrizap damages totaling $2,700,000.

Following the jury verdict, Woodstream filed this present Motion renewing its motion for judgment as a matter of law that it made at the close of evidence. Woodstream is seeking judgment as a matter of law on the fraudulent misrepresentation claim and on the infringement of Claim 16 of the 636 patent. Woodstream is also seeking judgment as a matter of law on its affirmative defenses of patent invalidity (for obviousness, incorrect inventorship, lack of written description/ new matter, and lack of enablement) and of inequitable conduct (for failure to disclose the prior public use of the Gopher Zapper to the Patent and Trademark Office and for removing Bruno Rist as a named inventor). In the alternative, Woodstream moves for remittitur of the fraudulent misrepresentation damages to $55,000 and for a new trial.

## II.   LEGAL STANDARDS

### A.   Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure, a party may renew its motion for judgment as a matter of law after the jury's verdict. Fed. R. Civ. P. 50(b). Rule 50(b) provides, in relevant part, that "[i]f the court does not grant a motion for judgment as a matter of

law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Id. "The movant may renew its request for judgment as a matter of law . . . and may alternatively request a new trial . . . under Rule 59." Id. In ruling on a renewed motion when a verdict was returned by the jury, a court may (A) allow the judgment to stand; (B) order a new trial; or (C) direct entry of judgment as a matter of law. Id.

     A judgment as a matter of law may be granted only if "there is no legally sufficient evidentiary basis for a reasonable jury" to find for the nonmoving party. Fed. R. Civ. P. 50(a). Such a motion will only be granted if, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). The court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Id. "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." Id. The question for the court is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which the jury could properly find a verdict for that party. Id.

     B.    Motion for Remittitur

     In general, remittitur is only granted if the verdict awarded is "so grossly excessive as to shock the judicial conscience." Johnston v. Sch. Dist. Of Phila., No. 04-4948, 2006 WL 999966, *6 (E.D. Pa. Apr. 12, 2006) (quoting Keenan v. City of Phila., 983 F.2d 459, 469 (3d Cir. 1992)). If a trial judge, in his or her discretion, finds that the jury's decision is clearly unsupported and/

or excessive in light of the evidence, and where no clear judicial error or pernicious influence can be identified, the judge shall order the plaintiff to remit a portion of the verdict in excess of the maximum amount supportable by the evidence or, if plaintiff refuses remittitur, the judge shall submit the issue of damages to a new trial.  Parkway Garage, Inc. v. City of Phila., No. 90-7752, 1994 WL 412430, *6 (E.D. Pa. Aug. 3, 1994).  This Court has broad discretion in whether to grant remittitur because a district court is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion.  Id.; Spence v. Bd. of Educ., 806 F.2d 1198, 1201 (3d Cir. 1986); Johnston, 2006 WL 999966 at *6.

      C.     Motion for a New Trial

As stated above, a party making a renewed motion for judgment as a matter of law, may move, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59.  A new trial may be granted after a jury verdict "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59.  "A new trial is appropriate only when the verdict is contrary to the great weight of the evidence of errors at trial produce a result inconsistent with substantial justice."  Sandrow v. United States, 832 F. Supp. 918, 918 (E.D. Pa. 1993).

**III.   DISCUSSION**

      A.     Renewed Motion for Judgment as a Matter of Law

          1.     Infringement of Claim 16

Woodstream contends that it is entitled to judgment as a matter of law because its microprocessor-based Electronic Mouse and Rat Traps ("EMT's" and "ERT's") cannot literally infringe Claim 16 of Agrizap's 636 patent.  According to Woodstream, Claim 16 is an apparatus

claim that recites specific mechanical and electronic components of the 636 patent and its EMT's and ERT's do not contain these components but rather are microprocessor-based systems. Woodstream cites Overhead Door Corp. v. The Chamberlain Group, Inc., 194 F.3d 1261 (Fed. Cir. 1999), as support for the proposition that a microprocessor cannot, as a matter of law, literally infringe specifically claimed mechanical and electronic structures. Infringement under such circumstances can only be supported by the doctrine of equivalents, a theory which was not applicable to this case. Agrizap counters that Overhead Door does not stand for so sweeping an assertion that microprocessors cannot literally infringe a hard-wired circuit structure. Additionally, Agrizap argues that Claim 16 does not even require hard-wired circuitry and it believes that the testimony of its expert, Dr. Feinberg, was legally sufficient for the jury to reasonably find in Agrizap's favor.

As Claim 16 is an apparatus claim, this Court construed it to consist of specific electronic components, such as a high voltage and current generator, a resistive switch, a trigger circuit, and a timing module. See Agrizap, Inc. v. Woodstream Corp., 431 F. Supp. 2d 518, 531 (E.D. Pa. 2006). Subparagraphs (b)(i), (b)(iii), and b(iv) of Claim 16 were at issue in this case. Below is the text of these subparagraphs of Claim 16 followed by this Court's claim construction of them. See id. at 531-532.

Subparagraph (b)(1) of Claim 16 states:

b) an electronic portion comprising:
i) a resistive switch coupled between said high voltage electrode and said reference electrode, said resistive switch further comprising a trigger circuit having a trigger output and an arm/ disarm input.

This claim was construed as: a switch that is physically connected across the electrodes. The

switch includes a distinct trigger circuit with a trigger output and an arm/ disarm input.

    Subparagraph (b)(iii) of Claim 16 states:

    a timing module having an input coupled to said trigger output of said resistive switch, a control output coupled to said generator control input and an arm/ disarm output coupled to said arm/ disarm input of said resistive switch.

This claim was construed as: a specific distinct timing module having an input and two outputs. The input is connected to the trigger output of the resistive switch. A control output is connected to the high voltage generator control input. An arm/ disarm output is connected to the arm/ disarm input of the resistive switch.

    Lastly, the last clause of subparagraph (b)(iv) states:

    said timing module disarms said trigger circuit of said resistive switch upon said activation of said timer module until said timer module is reset.

This clause was construed as: the timing module has an output that is coupled to the trigger circuit of the resistive switch to disarm the trigger circuit until a power on reset signal re-enables or re-sets the timing module.

    To address Woodstream's arguments about <u>Overhead Door</u>, this Court will provide a brief overview of its relevant parts. <u>Overhead Door</u> concerned two parties, the Chamberlain Group, Inc. and Overhead Door Corp. that both manufacture remote control garage door opener systems. 194 F.3d at 1264. Overhead Door sought a declaratory judgment that its Intellicode garage door opener system did not infringe the 364 patent, Chamberlain's garage door opener system. <u>Id.</u> at 1266. Remote control garage door systems usually include a portable transmitter and a stationary garage door opening motor with a processing unit and receiver. <u>Id.</u> at 1264. The transmitter sends a signal to the receiver to open or close the garage door. <u>Id.</u> These systems

utilize coded signals to prevent signals from foreign transmitters from opening the door. Id. Thus, a unique code links each transmitter to its own system. Id. The 364 patent enabled a garage door opener to learn the identities of and respond to multiple transmitters with different codes. Id. Overhead Door's Intellicode system also can learn to identify multiple transmitters. Id. at 1266.

Both inventions store transmitter codes in selected memory locations during the learning process. Id. While the 364 patent uses a manual, mechanical memory switch to perform this function, the Intellicode system does not. Id. Instead, the Intellicode system uses "software that determines the memory location for each new code." Id. "The Intellicode's microprocessor, under control of the software, identifies unused locations in memory and automatically stores a new code in an unused and available location." Id.

The claim language of the 364 patent in question is "a memory selection switch connected to said microprocessor." Id. at 1265. The district court construed this claim:

> to mean "a switch separate from the microprocessor which is user operated to select different positions of the switch." The claim uses the term "switch," a word connoting a mechanical device with different settings, such as "on" and "off." Claim 1 further defines the memory selection switch as "connected to" the microprocessor, "setable in" a first position, and "set in" a second position. This claim language is more consistent with a mechanical switch attached to the microprocessor, rather than software programmed into the microprocessor.

Id. at 1267. The Federal Circuit interpreted "memory selection switch" to mean "a mechanical switch with different positions, each position corresponding to a different location in memory, thus enabling the garage door operator to store codes in different memory locations." Id. at 1269. Thus, the Federal Circuit affirmed the district court's interpretation of "memory selection switch." Id.

Using this interpretation, the Federal Circuit affirmed the district court's finding of no literal infringement. The Federal Circuit held that the claim language in the 364 patent covers a mechanical memory selection switch and the Intellicode system, in contrast, selects memory locations with a software program, not with a mechanical switch. Id. Thus, the "memory selection switch" is literally absent from the Intellicode system. Id.

Agrizap views Overhead Door as simply stating that there was no literal infringement because the memory selection switch connected to the microprocessor is absent from the Intellicode system, which only has a microprocessor and no switch. Thus, Agrizap understands this case as saying nothing about whether microprocessors can literally infringe hardwired structures. Moreover, Overhead Door is inapplicable to this present case because neither Claim 16 nor its claim construction require an element connected to a microprocessor.

Overhead Door, however, is not simply about a lack of literal infringement because the accused device is missing a switch connected to the microprocessor. Rather, the opinion's focus was on the fact that a microprocessor/ software implementation of a memory selection function cannot literally infringe a mechanical switch implementation of that same function. The 364 patent has a mechanical "memory selection switch" that selects memory locations. The Intellicode system has a software program to select memory locations. Both inventions have a common functionality: selecting memory locations. However, each invention uses a different structure to achieve the function: a mechanical switch in the 364 patent and a microprocessor in the Intellicode system. The Federal Circuit viewed the switch and the microprocessor as different structures and found no literal infringement. The court did, however, find that the doctrine of equivalents could possibly apply. Id. at 1269-71. So at best, software

implementation of certain mechanical implementations can only be infringed under the doctrine of equivalents.[1]  See id.; Dan L. Burk & Mark A. Lemley, Is Patent Law Technology-Specific? 17 Berkeley Tech. L. J. 1155, 1172 (2002).  Accordingly, in this present case, the microprocessor-based implementation of the functions of an electronic rat trap cannot literally infringe specific, physical electronic components, such as a resistive switch, trigger circuit, and timing module, that implements those same functions.

Moreover, the fact that the code instructions and the microprocessor of the EMT's and ERT's carry out the same functions as Claim 16 does not establish literal infringement.  Claim 16 is solely an apparatus claim, so it has nothing to do with functionality.  "[A]pparatus claims cover what a device is, not what a device does."  Hewlett-Packard Co. V. Bausch & Lomb Inc., 909 F.2d 1464, 1468 (Fed. Cir. 1990).  Therefore, any arguments about the code and the microprocessor carrying out the same function as Claim 16 are irrelevant.

This Court must also address Agrizap's argument that Dr. Feinberg provided legally sufficient evidence to establish literal infringement of Claim 16.  Dr. Feinberg "explained that although the circuits in the Woodstream traps are governed by a microprocessor running code instructions, physical components are still required to carry out the code instructions, and are thus necessarily present."  (Agrizap's Resp. to Woodstream's Renewed JMOL Mot., 7-8).  "He further explained that those physical components are located inside the microprocessor, and must be present to carry out the specified code instructions.  From this, the jury could - and did - reasonably conclude that the specified physical circuits exist in the microprocessor."  (Id. at 8.)

---

[1] Two commentators have actually found it troubling that cases, such as Overhead Door suggest that software implementations of certain ideas are equivalent to older mechanical implementations.  Burk & Lemley, 17 Berkeley Tech. L. J. at 1172.  If these commentators find equivalency troubling, this Court can logically infer that they would not think literal infringement is a possibility.

The specific, physical electronic and mechanical components described in Claim 16 are not present within the microprocessor.  Just because two devices do the same function does not mean that they must have the same structure.  While Dr. Feinberg gave factual testimony that the components of Claim 16 are actually located within the microprocessor, his contentions are untenable in light of the Federal Circuit's holding in Overhead Door.  As explained above, that case shows that the structure of a microprocessor cannot literally infringe mechanical structures.  While the Federal Circuit did not even address whether the components inside the microprocessor literally infringed the mechanical memory selection switch, it did not need to because the fact that a microprocessor itself is different from the switch in question was enough to find no literal infringement.

In conclusion, the structural limitations of Claim 16, i.e., the resistive switch, trigger circuit, and timing module, and the connections between them, are not literally present in Woodstream's EMT and ERT.  "Literal infringement of a claim requires that every limitation recited in the claim appear in the accused device, i.e., that the properly construed claim reads on the accused device exactly."  Amhil Enterprises Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996).  "To infringe an apparatus claim, the device must meet all of the structural limitations."  Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1311-12 (Fed. Cir. 2005).  While even though Dr. Feinberg provided evidence at trial that the components recited in Claim 16 were literally present within the ERT and EMT microprocessor, his testimony is in contradiction of the law.  A microprocessor that does the same thing as distinct physical, electronic components is not literally infringing.  They may do the same function, but they are not the same device.  And when looking at infringement of an apparatus

claim the issue is on what the device is not was it does. Therefore, Woodstream's EMT and ERT do not literally infringe Claim 16 of the 636 patent and Woodstream is entitled to judgment as a matter of law.

### 2. Woodstream's Affirmative Defenses

Woodstream also argues that it should be granted judgment as a matter of law on all of its affirmative defenses to patent infringement. Prior to trial, Woodstream moved for summary judgment based on those defenses. This Court denied that motion. See Agrizap, Inc. v. Woodstream Corp., 431 F. Supp. 2d 518, 532-544 (E.D. Pa. 2006).

The standard for summary judgment mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The primary difference between the two motions is procedural. Id. at 251. Summary judgment motions are usually made before trial and decided on documentary evidence and judgment as a matter of law motions are made at trial and decided on evidence admitted at trial. Id. Nevertheless, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id.

At trial, Agrizap and Woodstream presented similar arguments and similar evidence for these defenses as they did at the summary judgment stage. This means that at both stages of the case, a sufficient disagreement between the parties existed as to prevent this Court from making a judgment as a matter of law. The jury thereby was not unreasonable and had a sufficient evidentiary basis for its decision in favor of Agrizap on these defenses. Because of the

similarities between this motion and the summary judgment motion, this Court's reasoning for denying summary judgment is applicable here and should be incorporated by reference. See Agrizap, 431 F. Supp. 2d at 532-544.  Therefore, Woodstream's renewed motion for judgment as a matter of law on the defenses to patent infringement is denied.

   3.   Fraudulent Misrepresentation

Woodstream contends that it should be granted JMOL on Agrizap's Fraudulent Misrepresentation Claim, because there was insufficient evidence produced at trial to permit a reasonable jury to conclude that Agrizap had met its burden of proof with respect to the elements of fraudulent misrepresentation.  Those elements are:

(1) A representation:
(2) Which is material to the transaction at hand;
(3) Made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;
(4) With the intent of misleading another into relying on it;
(5) Justifiable reliance on the misrepresentation; and
(6) The resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

(1) A Representation

At trial Agrizap produced evidence that on August 15, 2000, Robert Noe sent an e-mail to Andy Woolworth, Executive Vice-President of Woodstream, indicating that Noe was aware that Woodstream had sent Rat Zappers to China.  Noe stated in part, "We want your assurance that this manufacturer or any other contact of yours will not, directly or indirectly, attempt the cloning of any of our product line."  (Tr. 2/20/07, pp. 86:1-87:11; PX 39.)

On August 25, 2000, Andy Woolworth responded to this request in an e-mail which stated "Bob - Please reference our point 5 of the confidentiality agreement to cover your

concern below. We asked a source that does millions of dollars of work for Woodstream in an ISO 9000 facility to quote on the product." (Tr. 2/20/07, p. 88:16-91:9, 92:3-6; PX 40.)

(2) <u>The Represention would have been material to the transaction.</u>

There is evidence at the trial that Woodstream was aware that if Agrizap found out about the competing product it was developing it would refuse to deal with Woodstream. (Tr. 2/28/07, pp. 183:14: Tr. 3/1/07, pp. 59:16-64: 23; PX 23, PX 165.)

There was evidence at trial that indicated that when Agrizap found out about Woodsteam's competing product, it did in fact refuse to sell anymore Rat Zappers to Woodstream. (Tr. 2/20/07, p. 116:13-20.) Mr. Noe testified that he would have considered the fact that Woodstream was considering developing its own competing traps to be important. (Tr. 2/20/07, pp. 114:9-116:23.) The jury could have reasonably concluded from the evidence that Mr. Woolworth did not respond honestly to Mr. Noe's request for assurance, and that if he had, Mr. Noe would never have agreed to allow Woodstream to sell Rat Zappers under its Victor label. Under these circumstances the jury could find that the representation was material.

(3) <u>Representation made falsely, with knowledge or recklessness to whether it was true or false.</u>

From the exchange of e-mails in PX 39 and PX 40, a jury could conclude that Mr. Woolworth was displaying a reluctance to respond directly to Mr. Noe's original question: "we want your assurance that this manufacturer or any other contact of yours will not directly or indirectly attempt the cloning of any of our product line." (PX 39, e-mail of 8/15/00.)

The e-mail from Mr. Woolworth to Mr. Noe of 8/24/00, (PX 40), ignores the question. This prompts another e-mail from Mr. Noe to Mr. Woolworth dated 8/26/00 (New Zealand time) in which Mr. Noe finds it necessary repeat his request.

Finally, in an e-mail dated 8/25/00 (U.S. time) Woolworth sent the reply that seems to have satisfied Mr. Noe's concern. (PX 40)

There was also evidence presented to the jury that approximately 5 days after this exchange of e-mails, Woodstream instructed its Chinese supplier that it would make the product itself. (Tr. 2/26/07, pp. 116:13-119:4; PX 37; PX 40, PX 41.) The reluctance to answer Mr. Noe's original question and the speed with which Woodstream proceeded with the decision to make the product itself would justify a jury's conclusion that Mr. Woolworth knew that the statement contained in his 8/25/00 e-mail was not correct.

(4) <u>With the intent of misleading another into relying on it.</u>

As soon as Agrizap discovered that Woodstream had introduced a competitive electronic mousetrap Agrizap terminated the relationship with Woodstream. (Tr. 2/20/07, pp. 114:9-116:23.) The jury also heard testimony from Woodstream employee Steve Polisoto indicating that Woodstream knew Agrizap would discontinue sales to Woodstream once Agrizap found out about Woodstream's competing product. (PX 20; PX 26; PX 164; Tr. 3/1/07, pp. 60:2-64:22.) There was also evidence that Woodstream actively sought to prevent Agrizap from finding out that it was considering developing a competing trap. (DX 130; PX 44; Tr. 2/28/07, pp. 37:9-40:12.)

From the foregoing the jury could certainly conclude that Woodstream intended Agrizap to rely on Mr. Woolworth's statement to Mr. Noe as to why the Rat Zapper was sent to China.

(5) <u>Justifiable reliance on the misrepresentation</u>

Agrizap presented evidence from which the jury could find that Agrizap

reasonably relied upon Woodstream's misrepresentations. Woodstream frequently referred to Agrizap as a "partner", causing Agrizap to believe that the two companies were working together and that Mr. Woolworth's previous representations to Mr. Noe were truthful. (Tr. 2/20/07, p. 95:2-7; Tr. 2/22/07, pp. 120:8-22, 128:20-130:13; PX 38; PX 12; PX 13; PX 19; PX 52; PX 153.) Agrizap even provided training to Woodstream employees regarding the Rat Zapper. (Tr. 2/22/07, pp. 142:4-144:16.)

      (6) <u>The resulting injury was proximately caused by the reliance</u>.

Woodstream contends that Agrizap failed to support the award of damages with sufficient evidence.

> [U]nder Pennsylvania law, in an action based on fraud, the measure of damages is "actual loss" and not the benefit, or value, of that bargain. The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations.
>
> The determination of damages is a factual question to be decided by the fact-finder. This duty of assessing damages is within the province of the fact-finder and should not be interfered with unless it clearly appears that the amount awarded resulted from partiality, caprice, prejudice, corruption or some other improper influence. The fact-finder must assess the worth of the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence.
>
> The standard in Pennsylvania civil cases for determining future damages is that the plaintiff bears the burden of proof by a "preponderance of the evidence." Under this criterion, the plaintiff is required to furnish only a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages. Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based

> on speculation or guesswork. Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation. While the trier of fact may not use sheer conjecture as a basis for arriving at a verdict, it may use a measure of speculation in aiming at a verdict or an award of damages, and an even greater degree of flexibility is granted in regard to testimony concerning prospective or future damages, which are at best, not always easy or certain of ascertainment and are to a large extent based on probabilities and uncertainties. So then, mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct.
>
> Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. Although the law does not command mathematical precision from evidence in finding damages, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture. Where the amount of damage can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy. It is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss.
>
> *Delahanty,* 464 A.2d at 1257-1258 (internal citations omitted) (emphasis supplied).

The jury awarded damages of $1.275 million dollars for fraudulent misrepresentation. At trial Agrizap claimed that had it known the truth, [i.e. had it known that Woodstream sent the Rat Zapper to China for a reason other than costing] it would not have continued the purchase order arrangement with Woodstream. In other words Agrizap would have continued to market and sell Rat Zappers itself from September 2000 onward, just as it had done previously. Agrizap's evidence as to damages, revealed at least from Agrizap's point of

16

view, that as a result of the fraud Agrizap continued to sell Rat Zappers to Woodstream. Agrizap provided evidence from which the jury could conclude that it would not have continued to give a preferred price to Woodstream, and would not have provided Woodstream with the means to enter the electronic rat and mouse trap market in the year 2000, if it knew at the very time it did so, Woodstream had sent its product to China for the purpose of "designing around" it or "cloning" it.

Agrizap would not have given Woodstream exclusive access to certain large retailers in the market, i.e. Home Depot, Ace Hardware, thus, allowing Woodstream to establish itself in those markets years earlier than it could otherwise have. (Tr. 2/22/07, pp. 139:14-141:5; PX 47). To this Woodstream argues that Home Depot and Ace Hardware would not have bought Rat Zappers from a small operation such as Agrizap anyway. But, that argument is speculation and the jury did not accept it. What is not speculation is that once Agrizap allowed a larger corporation such as Woodstream to develop those markets it would have <u>no</u> chance to win them back, competing against an almost identical product. Certainly the jury had the right to consider how that would impact future loses to Agrizap.

Not only did Agrizap defer to Woodstream in certain markets, Scott Heaton an Agrizap employee at the time, testified about training Woodstream sales people to sell Rat Zappers. (Tr. 2/22/07 141:4-8).

Not only were there lost sales from the years 2000 to 2003, there were lost future sales from markets Agrizap will probably never win back competing against such a well established company as Woodstream.

Agrizap presented evidence relating to the total market share of the electronic

mousetrap industry compared to other non-electronic traps. (PX 14; Tr. 2/27/07, pp. 201:24-204:11.) Agrizap's evidence showed that the total market share of the industry is $20 million per year. (PX 14 @ W903). Woodstream's goal was to gain a first-in market share penetration of 50% of this total market share in five years. (Id.)

Based upon this evidence the jury returned a verdict of $1.27 million. Given the financial data that was presented to the jury and drawing inferences in favor of Agrizap, the jury was not unreasonable in awarding $1.275 million dollars for past and future damages to Agrizap as a result of Woodstream's fraudulent misrepresentations concerning its intentions with respect to its sending the Rat Zappers to China.

### B. Motion for Remittitur

Defendants' Motion for Remittitur is denied for the same reasons discussed in our denial of Defendants' JMOL motion as to fraudulent misrepresentation.

### C. Motion for a New Trial

In the alternative, Woodstream requests that this Court grant a new trial on all the claims and defenses because "the jury's verdict 'is contrary to the great weight of the evidence or errors at trial produce a result inconsistent with substantial justice.'" (Woodstream's Renewed JMOL Mot., 3 (citing Mullins v. City of Phila., No. 06-2186, 2007 U.S. Dist. LEXIS 16114, *4 (E.D. Pa., Mar. 7, 2007))). Woodstream, however, has not provided any specifics as to why a new trial should be granted. Woodstream has neither explained why the jury's verdict was contrary to the weight of the evidence nor has indicated any trial errors that resulted in substantial injustice. Therefore, Woodstream's Motion for a New Trial is denied.

We therefore enter the following Order.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AGRIZAP, INC., | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | No. 04-3925 |
| | : | |
| WOODSTREAM CORPORATION, et al., | : | |
|     Defendants. | : | |

**O R D E R**

**AND NOW**, this 15th day of May, 2007, for the reasons set forth in the foregoing Memorandum we hereby enter the following:

    1. Woodstream's Motion for Judgment as a Matter of Law (Doc. No. 222) is **GRANTED** as to Agrizap's claim of infringement as to independent Claim 16 of the 636 patent.

    2. Woodstream's Motion for Judgment as a Matter of Law is **DENIED** as to its affirmative defenses of patent invalidity (for obviousness, incorrect inventorship, lack of written description/new matter and lack of enablement) and of inequitable conduct (for failure to disclose the prior public use of the Gopher Zapper to the Patent and Trademark Office and for removing Bruno Rist as a named inventor).

    3. Woodstream's Motion for Judgment as a Matter of Law as to Agrizap's fraudulent misrepresentation claim is **DENIED.**

    4. Woodstream's Motion for Remittitur is **DENIED.**

    5. Woodstream's Motion for a New Trial is **DENIED.**

                                                    BY THE COURT:

                                                    /s/ Robert F. Kelly
                                                    ROBERT F. KELLY,      Sr. J.